**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISITRICT OF COLUMBIA**

| | |
|---|---|
| RITA CAMPBELL<br>1515 Michigan Avenue NE<br>Washington, DC 20017<br><br>on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.; AMERICAN INTERNATIONAL GROUP, INC., d/b/a AIG INSURANCE TRUST, FOR THE ACCOUNT OF HEALTHEXTRAS; CATAMARAN HEALTH SOLUTIONS, LLC, f/k/a CATALYST HEALTH SOLUTIONS INC., f/k/a HEALTHEXTRAS, INC.; ALLIANT INSURANCE SERVICES, INC.; ALLIANT SERVICES HOUSTON, INC.; VIRGINIA SURETY COMPANY, INC.;  and HEALTHEXTRAS, LLC,<br><br>    Defendants. | Case No. |

## CLASS ACTION COMPLAINT

        Plaintiff Rita Campbell, by counsel, on behalf of herself and all other similarly situated

residents of the District of Columbia, for her class action complaint against Defendants National

Union Fire Insurance Company of Pittsburgh, PA; American International Group, Inc., d/b/a AIG

Insurance Trust, for the Account of HealthExtras; Catamaran Health Solutions, LLC, f/k/a Catalyst

Health Solutions inc., f/k/a HealthExtras Inc.; Alliant Insurance Services, Inc.; Alliant Services

Houston, Inc.; Virginia Surety Company, Inc.; and HeathExtras, LLC, alleges as follows, based on personal knowledge as to her own acts and on information and belief as to the acts of others:

## PARTIES AND RELEVANT NON-PARTIES

1.    Plaintiff Rita Campbell is a resident of the District of Columbia who purchased insurance coverage advertised under the name HealthExtras that purportedly provided her with a One Million Dollar ($1,000,000.00) lump sum Accidental Permanent and Total Disability Benefit in the event that the named insured became permanently disabled and could not return to work, underwritten by National Union Fire Insurance Company of Pittsburgh, PA.   Plaintiff also purchased a Two Thousand Five Hundred ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit policy underwritten by Virginia Surety Company, Inc.

2.    Defendant National Union Fire Insurance Company of Pittsburgh, P.A., (hereinafter "National Union") was and is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has done business at all relevant times in the District of Columbia, with its principal office located at 175 Water Street, 18th Floor, New York, NY 10038. Defendant National Union was owned by American International Group, Inc. ("AIG") and now is a wholly owned subsidiary of Chartis U.S., Inc. Upon information and belief, Defendant National Union, at all times relevant to this action, was licensed as an insurance company and/or underwriter in the District of Columbia and the United States of America.

3.     Defendant American International Group, Inc., d/b/a "AIG Group Insurance Trust, for the Account of HealthExtras," (hereinafter "AIG") is a corporation organized and existing under the laws of the State of Delaware,  with its principal place of business located at 2 Peach

Tree Hill Road, Livingston, New Jersey.  Defendant AIG has conducted business at all relevant times in the District of Columbia.

4.      HealthExtras, Inc., (hereinafter "HealthExtras Inc.") was formed in 1997 under the laws of the State of Delaware and has done business at all relevant times in the District of Columbia. Upon information and belief, HealthExtras, Inc. was never licensed or authorized by the District of Columbia to conduct business in the District of Columbia or to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

5.      Catalyst Health Solutions, Inc. (hereinafter "Catalyst") was and is a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the District of Columbia. Upon information and belief, Catalyst was never licensed or authorized by the District of Columbia to conduct business in the District of Columbia or to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

6.      Defendant Catamaran Health Solutions, LLC f/k/a Catalyst Health Solutions, Inc., f/k/a HealthExtras, Inc. is a limited liability company organized and existing under the laws of the State of Delaware and has done business at all relevant times in the District of Columbia.  Upon information and belief, Catamaran was never licensed or authorized by the District of Columbia to conduct business in the District of Columbia or to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

7.      Upon information and belief, HealthExtras Inc. was incorporated in 1997 and changed its name to Catalyst Health Solutions, Inc. in 2008.  Catalyst Health Solutions, Inc., was

purchased by SXC Health Solutions in July 2012.  Those companies merged together to form Catamaran Health Solutions, LLC in July 2012.  Defendant HealthExtras, Inc. has asserted that on October 1, 2008, it changed its name to Catalyst Health Solutions, Inc., and therefore, it no longer exists.  However, HealthExtras, Inc. and its successor corporations Catalyst Health Solutions, Inc., and Catamaran Health Solutions, LLC continued to operate under the name of "HealthExtras" to conduct business, service and administer the disability policy that are the subject of this lawsuit until at least August 1, 2012.  HealthExtras, Inc., Catalyst, and Catamaran have all operated at some time under the name of "HealthExtras" to conduct business, and to service and administer the disability policy that is the subject of this lawsuit until at least August 1, 2012.  However, contrary to the assertion that the Healthextras Inc., changed its name, it, along with Catalyst and Catamaran continued to operate under the name "Healthextras" by communicating in writing with other insureds around the country via the United States mail and via electronic mail using the name "Healthextras" on correspondence.   Further confusing matters, even though Catamaran insists on referring to itself as Catamaran, it has represented and referred to itself as the "HealthExtras Defendants" in other pending Federal Court actions involving the HealthExtras Scheme. Consequently, the Plaintiff will refer to these entities separately but as one Defendant  "Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc." in this Complaint.

8.    Defendant Alliant Insurance Services Inc., was and is a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the District of Columbia, with its principal office located at 1301 Dove Street, Suite 200, Newport Beach, CA 92660.  Alliant Insurance Services Inc., f/k/a Driver Alliant Insurance Services Inc., is registered as a corporation with the District of Columbia to conduct business in the District of

Columbia, but upon information and belief was never licensed to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

9.      Defendant Alliant Services Houston, Inc., was and is a corporation organized and existing under the laws of the State of New York and has done business at all relevant times in the District of Columbia. Alliant Services Houston, Inc., f/k/a JLT Services Corporation, is registered as a corporation with the District of Columbia to conduct business in the District of Columbia, but upon information and belief was never licensed to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

10.     Hereinafter, the Defendants named as Alliant Insurance Services Inc., and Alliant Services Houston, Inc., will collectively be referenced as "Alliant".

11.     Defendant Virginia Surety Company, Inc. (hereinafter "Virginia Surety") was and is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 175 West Jackson Boulevard, 11th Floor, Chicago, IL, 60604.  Upon information and belief, Virginia Surety was never licensed or authorized by the District of Columbia to conduct business in the District of Columbia or to conduct insurance transactions in the District of Columbia, including the marketing and sale of insurance products in the District of Columbia.

12.     Defendant HealthExtras, LLC (hereinafter "HealthExtras, LLC") is a limited liability company, formed and organized under the laws of the State of Delaware by officers and directors of HealthExtras, Inc. and Catalyst in October 2010.  In July 2012, HealthExtras, LLC was owned and operated by Catamaran Corp., a publicly traded company and the parent company

of Catamaran Health Solutions, LLC.  On August 1, 2012, the Catamaran Corp. sold HealthExtras

LLC to a different entity and caused the HealthExtras disability policy that is the subject of this

lawsuit to be transferred to it for servicing, administration and collection of insurance premiums.

HealthExtras LLC currently services, administers, collects and allocates premiums for the

insurance Scheme complained of herein and continues to use the same trade name of

"HealthExtras" used by Catamaran , f/k/a, Catalyst, f/k/a HealthExtras Inc.  Upon information ad

belief, HealthExtras LLC was never licensed or authorized by the District of Columbia to conduct

business in the District of Columbia or to conduct insurance transactions in the District of

Columbia, including the marketing and sale of insurance products in the District of Columbia.

## JURISDICTION, VENUE, AND CHOICE OF LAW

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness

Act, 28 U.S.C. § 1332(d), because there are 100 or more Class Members and the aggregate amount

in controversy exceeds Five Million Dollars ($5,000,000.00) exclusive of interest and costs.

Additionally, at least one Class Member is a citizen of a state different from the corporate

domiciles of the Defendants.

14.     The Defendants, collectively and individually, at all relevant times herein

conducted substantial business in this district, many of the violations occurred in this district, and

many of the acts and transactions alleged in this Complaint occurred in this district.

15.     The Court has personal jurisdiction over all the Defendants, who have at least

minimum contacts with the District of Columbia because the Defendants conduct business there

and have availed themselves of District of Columbia markets through its promotion, sales and

marketing efforts, as well as the Defendants' issuance of insurance policies and collection of premiums within the District of Columbia to and from residents of the District of Columbia.

16.     The District of Columbia's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1, of the U.S. Constitution. The District of Columbia has a significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff, thereby creating state interests that ensure that the choice of District of Columbia law is not arbitrary or unfair.

17.     The Defendants' actions and omissions of which Plaintiff complains were directly targeted at residents of the District of Columbia and are in derogation of the District of Columbia's interest in the regulation of products sold and administered within the District.  The District of Columbia has an interest in regulating the Defendants' conduct in marketing, selling, collecting premiums for and administering insurance products within its borders to its residents and in preventing fraud and other misconduct being committed against those residents.

18.     District of Columbia residents were the target of these Defendants' marketing, selling, collecting premiums for and administration of insurance, and the Defendants' misconduct injured and affected Plaintiff and the Class Members residing in the District of Columbia

19.     Accordingly, the application of the District of Columbia's laws to the Plaintiff and proposed Class Members is appropriate under the District of Columbia's choice of law rules because the District of Columbia has significant contacts to the claims of the Plaintiffs and all members of the proposed Class, and the District of Columbia has a greater interest in applying its laws here than any other jurisdiction.

20.     Venue in the United States District Court for the District of Columbia is proper because Defendants transact business within this District and a substantial part of the events giving rise to the claims at issue in this Complaint occurred in this District.

21.     The District of Columbia's substantive laws apply to the proposed Class, as defined herein, because Plaintiff properly brings this Class Action Complaint in this District alleging violations of District of Columbia law.

## PRELIMINARY ALLEGATIONS

22.     This matter is governed by the laws of the District of Columbia.  This matter is not governed by ERISA, 29 U.S.C. § 1001, *et seq.*

23.     This action arises from the wrongful conduct of the Defendants toward the Plaintiff and others similarly situated in the District of Columbia.  Defendants' wrongful conduct included a scheme (defined herein as the "HealthExtras Scheme") which involved fraudulent advertising, marketing, and sale of purported group disability insurance to District of Columbia residents who were not members of any group for which such an insurance product was authorized.  This purported insurance coverage was marketed and sold to District of Columbia residents for over a decade, despite the knowledge by each Defendant that the product was illegal and that the purported insurance coverage held pursuant to the HealthExtras Scheme is fraudulent and illusory, in that there was no present intention to pay claims under that purported coverage.

24.     The HealthExtras Scheme has operated in the District of Columbia for over a decade and continues to this day.  Defendants have also participated in similar schemes in other jurisdictions.

25.     Defendants are jointly and severally liable for the wrongful conduct alleged herein.

26.     This case seeks recovery of all premiums, treble and punitive damages, interest, as well as injunctive and other equitable relief, attorneys' fees and costs, including costs of investigation reasonably incurred, and other damages.

## CLASS ALLEGATIONS

27.     Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and as representative of a Class of individual residents of the District of Columbia who owned, purchased or paid premiums for disability insurance coverage with Defendants for disability insurance product known as "HealthExtras" from April 1, 2000 through the date of class certification.

28.     Plaintiff brings this action as class representatives to recover damages and/or refunds from these Defendants for: (a) Unjust Enrichment; (b) Breach of Duty of Good Faith and Fair Dealing; and (c) violation of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*

29.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1-4) and (b)(1).

30.     The proposed Class is defined and proposed as follows: All individual persons in the District of Columbia who own, owned and/or purchased disability insurance coverage and/or paid premiums for disability insurance known as HealthExtras with the Defendants from July 1, 2000 through the date of class certification.  Collectively, these persons will be referred to as the "Class" and/or "Class Members."

31.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

32.     Excluded from the Class are:

(a)     Defendants and any entities in which any Defendant has a controlling interest;

(b)     Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of any Defendants;

(c)     The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer or employees assigned to this case;

(d)     Claims for personal injury, wrongful death and/or emotional distress;

(e)     Actual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies;

(f)     Any attorneys representing the Plaintiffs or the Class;

(g)     All governmental entities; and,

(h)     Any person having entered into a release of claims with the Defendants concerning these allegations prior to the certification of this class.

33.     Numerosity. Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that their individual joinder is impracticable. The exact number or identification of the Class Members is presently unknown, but it is believed that there are over 100 and most likely thousands of Class Members. The identity of the Class Members is ascertainable. In addition to registration rolls

10

maintained by the Defendants, the Class Members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means.

34.    Predominance of Common Questions.  Fed. R. Civ. P. 23(a)(2), 23(b)(3).  Common questions of law and fact exist as to all the Class Members and predominate over questions affecting only individual Class Members.  These common questions include the following:

(a)    Whether Defendants sold disability policies and collected premiums for said insurance policies that were illegal under the law of the District of Columbia;

(b)    Whether Defendants illegally sold disability policies and collected premiums for those policies to a group of District of Columbia residents that was not and could not be a legal group under District of Columbia law;

(c)    Whether Defendants wrongfully increased premiums for those illegal policies;

(d)    Whether Defendants knew or should have known that selling and collecting premiums for the subject policies was illegal pursuant to applicable District of Columbia law and in derogation of the District of Columbia's interest in regulating the sale of insurance within its borders;

(e)    Whether the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class Members;

(f)    Whether Plaintiffs and the Class Members suffered any injury that was proximately caused by the unlawful acts alleged herein;

(g)     Whether the Defendants acted in conspiracy with each other to perform the illegal acts described herein; and,

(h)     Whether Plaintiff and the Class Members are entitled to recover damages proximately caused by the alleged unlawful conduct, including damages recoverable under the CPPA, punitive damages, interest, injunctive relief, attorneys' fees, and costs, including reasonable costs of investigation, and other damages.

35.     Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of claims of all of the Members of the Class, all of whom owned or purchased disability insurance coverage or paid premiums for disability coverage through a program known as HealthExtras from July 1, 2000 through the present date.

36.     Adequacy.     Fed. R. Civ. P. 23(a)(4); 23(g)(1).     Plaintiff is an adequate representative of the Class because she fit within the Class definition and her interests do not conflict with the interests of the Members of the Class she seek to represent.   Plaintiff will prosecute this action vigorously for the benefit of the entire Class, and agrees to participate in discovery and attend any Court hearings required of her.   Plaintiff is represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as Class Counsel.   Class Counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class.   Plaintiff and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

37.     Superiority. Fed. R. Civ. P. 23(b)(3). The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members'

claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The class, as defined herein, is ascertainable from the Defendants' records or from records which the Defendants have access and control.

### HISTORICAL BACKGROUND AND FACTUAL ALLEGATIONS

38.     Beginning in approximately 1997, HealthExtras, Inc. conceived, designed and created a Disability Benefit Program (the "HealthExtras Scheme"). HealthExtras contracted with the late Superman actor, Christopher Reeve, to endorse the HealthExtras Program. The development of the HealthExtras Program was initially funded by private investment with additional capital raised in 1999 through a public stock offering. The HealthExtras Program included (1) a One Million Dollar ($1,000,000.00) Accidental Permanent and Total Disability Benefit insurance coverage, and (2) a Two Thousand Five Hundred ($2,500.00) Out of Area Emergency Accident and Sickness Medical Expense Benefit.

39.     The insurance coverage for the benefits has been underwritten by several insurance companies because neither Defendants, HealthExtras, Inc., or its corporate successors, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. have ever been licensed or authorized by any jurisdiction or Department of Insurance to conduct the business of insurance. HealthExtras, LLC, the new corporate entity, which now services, administers, collects and allocates premiums for the insurance program has also never been licensed to conduct the business of insurance in any jurisdiction.

40.     The incorporators of HealthExtras Inc., including but not limited to David Blair, CEO of HealthExtras Inc., his father Thomas Blair, as well as Edward S. Civera and Chief Financial Officer, Mike Donovan conceived the HealthExtras Scheme for the purpose of defrauding consumers and gaining an unfair and illegal advantage in the disability insurance market by avoiding state insurance regulations and selling virtually worthless group disability insurance to individuals rather than an actual qualified group.

41.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.and its incorporators achieved the unfair advantage and consumer fraud in the following manner:

a.   Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.entered into agreements with the nation's largest VISA and MasterCard issuing banks (including but not limited to CitiBank, Capitol One and Chase), as well as American Express, and with other entities who held branded credit cards for their customers (including JC Penny, Sears and Conoco Phillips) allowing Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. access to their credit card customers to market the HealthExtras Program in all fifty (50) states and the District of Columbia.

b. These contracts allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. access to financial information of the cardholder to assess the prospect of that individual purchasing the HealthExtras Program.

c. By agreement, the credit card issuing companies allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. to include a marketing flyer in the cardholder's monthly credit card statements that were delivered to the individual through the United States Mail targeting individual consumers for the HealthExtras Program.

14

e. Originally, the marketing flyers offered a One Million Dollar ($1,000,000.00) disability insurance product called "HealthExtras" for as little as Nine Dollars and Ninety-Five cents ($9.25) per month or Fourteen Dollars and Fifty cents ($14.50) per month depending on whether the individual added his or her spouse.

f. The marketing flyers contained images of the late famed Superman actor, Christopher Reeve, as well as statements by Mr. Reeve endorsing the HealthExtras Program.

g. Included in the marketing flyers was a short application that allowed the individual cardholder to enroll in the HealthExtras Program by simply completing the application and sending it via the United States Mail in a prepaid envelope to HealthExtras, 6th Floor Processing Center, 2275 Research Blvd., Rockville, MD 20850-8526. This process allowed HealthExtras, Inc. to enroll large numbers of individual consumers rapidly and with very little expense with no lengthy applications or exams which would be typical of underwriting an individual disability policy.

h. Once the individual cardholder sent the application to HealthExtras, he or she was designated as a "member" of a fictitious group and placed into a "Trust" created by HealthExtras, Inc., and other Defendants, along with other credit card holders from all 50 states and the District of Columbia. Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. then began debiting the individual's credit card on a monthly or yearly basis for the insurance premium. Those premiums were then deposited into a "Trust" for distribution to the underwriters, the brokers and to Catamaran, f/k/a,

Catalyst, f/k/a HealthExtras Inc.

i.  Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. entered into contracts with various licensed insurance carriers to make application to each state insurance department for approval of a Group Disability Policy and underwrite the disability benefits for the HealthExtras Program.

j.  The underwriters either misrepresented to the state insurance regulators that the Group Disability Policy was intended to be issued to a valid group under state law, or simply failed to apply for approval of the Group Disability Policy.

42.     This illegal scheme allowed HealthExtras Inc. to market and sell the "group" disability policies directly to unaffiliated individuals and collect premiums directly from individuals.

43.     This illegal scheme allowed HealthExtras, Inc., to reap enormous profits.   After the Initial Public Offering ("IPO") of HealthExtras Inc., in 1999, in a year 2000 letter to the HealthExtras, Inc., shareholders, CEO David Blair reported that:

> Our revenues increased from $5.3 million in 1999 to $44.2 million in 2000 as our paid enrollments jumped from 105,000 to 450,000 over that period.   The increase in enrollments was primarily attributable to the addition of new marketing partners and obtaining approval to sell our products in more states.

*See* **Exhibit A.**

44.     This enormous immediate profit was created in the insurance market due to the fact that HealthExtras, Inc. avoided local insurance regulations requiring policies to be sold to an actual valid group, as defined by state law.  Avoiding insurance regulation, rate oversight and the scrutiny of an actual group allowed HealthExtras, Inc. to fraudulently market and sell illegal group

disability policies known as the HealthExtras Program to individuals on a large nationwide scale. These policies, disguised as inexpensive individual disability policies, were then placed in a sham "Trust for the Account of HealthExtras" to create the illusion of a valid group.

45.     The fraudulent HealthExtras Scheme resulted in a huge early financial windfall for HealthExtras, Inc., and CEO David Blair. After HealthExtras Inc., and its successor corporation Catalyst Health Solutions were sold for $4.4 billion to SXC Health Solutions, in July 2012 creating the company now known as Catamaran Health Solutions, LLC, David Blair received a $16 million dollar compensation package in 2012 according to a Securities & Exchange Commission filing. He had earned $9.4 million in 2011. Media reports suggest that David Blair, now 43, is contemplating running for the office of Governor of the State of Maryland.

46.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. knew that any underwriter of such insurance would necessarily be required to comply with the insurance regulations of the various fifty states and the District of Columbia.

47.     In accordance with the HealthExtras Scheme, in 1999 or 2000, HealthExtras, Inc. caused marketing materials to be sent to Plaintiff by mail.

48.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.'smarketing materials sent to the Plaintiff utilized the likeness of actor Christopher Reeve with statements by Mr. Reeve endorsing the HealthExtras Program.

49.     Upon information and belief, after expressing an interest in the HealthExtras program, Plaintiff received a letter via the United States mails in 2000 from Defendant HealthExtras, Inc. signed by a "Director of Client Services" that included the following statements:

Enclosed please find the HealthExtras program description you requested.  Because lives change in an instant, like Christopher Reeve's, HealthExtras was created to provide families with financial security should the unthinkable happen.

$1,000,000 cash payment if you are permanently disabled due to an accident.  And as a HealthExtras member, you have two tax-free options: a $1,000,000 lump sum cash payment or a $250,000 cash payment plus $5,000 per month for 20 years.

$2,500 a year in reimbursements for coinsurance and deductibles for healthcare expenses when you are traveling.

50.    This mail solicitation was intended to induce Plaintiff to purchase and retain the specified disability insurance, wherein Defendant HealthExtras, Inc. specifically offered Plaintiff the opportunity to purchase disability insurance.

51.    Because HealthExtras, Inc. was not a licensed insurance broker in any State or the District of Columbia, it fraudulently paid for the use of the name The Sklover Group, Inc, which was a real licensed broker and the corporate predecessor to JLT Services Corporation, which is now known as the Defendant, Alliant Services Houston Inc.  Since 2005, the name Alliant Services Houston Inc. has been used by the HealthExtras Scheme on correspondence and other documents to create the illusion that HealthExtras is a valid insurance broker.

52.    This written solicitation was typical of the solicitations used in the HealthExtras Scheme, which offered disability insurance to certain "targeted" credit card customers.

53.    Plaintiff enrolled in the HealthExtras "benefit program" and agreed to pay premiums which subsequently appeared as charges/debits on her credit card statements. Defendant Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. accepted Plaintiff's enrollment by letter from the Director, Member Services, that advised Plaintiff that "you have armed yourself with one of the most exciting and affordable disability plans found anywhere in America today."  Additionally, the acceptance letter included a photograph of Christopher Reeve and a message purportedly from

him that stated "[b]ecause lives can change in an instant, as mine did, you should have the additional security for yourself and your family that HealthExtras can provide."

54.     These charges that initially appeared on Plaintiff's credit card statements were shown as being from "C Reeve Disability Ins 800-554-6797 MD."  This entry on Plaintiff's credit card statements further confirmed to Plaintiff that she was buying disability insurance coverage.

55.     Plaintiff was charged premiums on a periodic basis, which depending on the period of time, was usually monthly or annually.  At various points in time, the HealthExtras Scheme offered a discount if purchasers paid the premium in a single annual lump sum payment, instead of on a monthly basis.

56.     In 2006, the entry on Plaintiff's credit card statement changed to "Accident Protection PL 800-554-6797 MD."

57.     During the course of the HealthExtras Scheme, premiums were increased at least twice without the approval of the District of Columbia Department of Insurance, Securities, and Banking ("DISB"). These increases occurred even after Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., capitalized on the September 11, 2001 terrorist tragedy by sending a letter to HealthExtras Program members in 2000 stating:  "As a valued member, we are pleased to inform you that your HealthExtras program fees will not increase in 2002 despite the huge financial impact the September 11th tragedy has had on the insurance industry."

58.     The disability coverage sold by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. purported to have two primary benefits.  First, the Accidental Permanent and Total Disability insurance purports to provide "coverage" of a One Million Dollar ($1,000,000.00) benefit in the event of permanent disability as a result of an accident.  Second, an Emergency Accident and

Sickness Medical Expense Benefit that is advertised and purported to cover up to Two Thousand Five Hundred ($2,500.00) in medical expenses in the event of accident or sickness while away from home.

59.     On January 1, 2005, Defendant National Union became the underwriter for the One Million Dollar ($1,000,000.00) Accidental and Permanent Total Disability Benefit.

60.     The Plaintiff's Two Thousand Five Hundred Dollar ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit has been underwritten by Virginia Surety Company, Inc. from the date of their enrollment to present.

61.     The Plaintiff paid accidental disability premiums from 2000 through 2014 for the accidental disability coverage sold to them by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.

62.     In 2004, Plaintiff received an "Accident Protection Plan Program Summary" and a "Description of Coverage" of their HealthExtras disability policy.   The "Description of Coverage" indicated that it was a "brief description of coverage available under policy series C11695DBG" and that "[i]f any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540519 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases."

63.     Although the Plaintiff was provided with a copy of policy series C11695DBG, she has never been provided a copy of Master Policy SRG 9540519 which is the operative policy.

64.     The Defendants have issued Master Policy SRG 9540519 only to themselves as the "policyholder."

65.     Further, neither policy series C11695DBG nor Master Policy SRG 9540519 have ever been issued to a lawful blanket group in the District of Columbia. Upon information and

belief, no member of the proposed class has ever been provided a copy of Master Policy SRG 9540519.

66.     The HealthExtras Plan Description (policy series C11695DBG) contains extremely restrictive, conflicting and confusing terms and exclusions which renders any disability insurance "coverage" virtually worthless to consumers and is in sharp contrast to and directly contradicts representations made in the marketing material developed and delivered to District of Columbia residents by the Defendants.

67.     What little coverage escapes C11695DBG may be further trumped and negated by Master Policy SRG 9540519 which Plaintiff, and the putative class, are never shown.

68.     Defendants' conduct directed to District of Columbia consumers, as described herein, began at least as early as 1999 and continues to this day.  Defendants have not ceased to market the product in violation of the District's laws, as alleged herein, and continue to injure the District's consumers as described herein.

## THE HEALTHEXTRAS SCHEME IS FRAUDULENT

69.      The marketing materials for the HealthExtras Program represented that it provided affordable coverage for low probability, high consequence events, such as disability.  Neither in those materials nor anywhere else, however, did any Defendant ever disclose that nearly all of the purported premiums paid by the victims went to marketing expenses and profits for HealthExtras or fees paid to the banks that made their credit card customer information available to HealthExtras for marketing purposes.

70.      For example, when monthly premiums for the One Million Dollar HealthExtras disability benefit were $15.95 per month, only $2.24 of that amount was paid to National Union,

the purported underwriter of the disability policy. In other words, less than 15% of the premium paid by members for disability coverage actually went to an insurance company. Roughly 80% of the insurance premiums paid to the HealthExtras Scheme by the Plaintiff has been collected by the Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. and has not paid for insurance coverage or paid for anything that would benefit the Plaintiff. Those funds have been collected by the HealthExtras entities to further the illegal HealthExtras Scheme and represent a loss to the Plaintiff as she derived no benefit from the payment of those funds to the HealthExtras Scheme.

71.     Persons who purchased purported disability insurance coverage under the HealthExtras Scheme have been denied disability benefits even after suffering catastrophic injuries which rendered them disabled.

72.     Although the coverage description disclosed some limitations on coverage under the policy, neither HealthExtras Inc., or HealthExtras, LLC, nor any other Defendant disclosed to the victims of the scheme, that only a small fraction of the purported premiums actually went to an insurance company, nor did they disclose there was no intention to pay disability benefits that fell within the terms of coverage. In other words, neither HealthExtras, Inc., nor any other Defendant ever disclosed that the purported disability insurance coverage was illusory.

### THE PURPORTED HEALTHEXTRAS DISABILITY POLICY IS ILLEGAL UNDER DISTRICT OF COLUMBIA LAW

73.     Defendants circumvented District of Columbia laws and regulations governing the issuance of group accident and sickness insurance in order to carry out the HealthExtras Scheme.

74.     D.C. Code § 31-4712, entitled "Accident and sickness policies," provides, in pertinent part:

*No policy of insurance* against loss resulting from sickness or from bodily injury or death by accident, or both, *shall be issued or delivered to any person in the District* by any company organized under this or any other law of the District, or, if a foreign or alien company, authorized to do business in the District, including, but not limited to, all Health Maintenance Organizations, Group Hospitalization and Medical Services, Inc., all life insurance companies licensed to do business in the District, and all for-profit as well as nonprofit health insurers issuing or delivering expense incurred accident and sickness health insurance policies and certificates, *until a copy of the form thereof, and of the classification of risks and the premium rates appertaining thereto, have been filed with the Commissioner*; nor shall it be so issued or delivered until the expiration of 30 days after it has been so filed, unless the Commissioner shall sooner give his written approval thereto. If the Commissioner shall give written notice to the company which has filed such form that it does not comply with the requirements of law, specifying the reasons for his opinion, it shall be unlawful thereafter for any such insurer to issue any policy in such form. Rates filed with respect to a policy or certificate subject to the Reasonable Health Insurance Ratemaking Reform Act of 2010 [Chapters 30A, 31C, and 33A of this title] shall also comply with the provisions of such act . . .

N*o policy of accident and sickness insurance shall be delivered* or issued for delivery to any person in the District *unless . . . [i]t purports to insure **only 1 person***, except that a policy may insure, originally or by subsequent amendment, upon the application of an adult member of a family who shall be deemed the policyholder, any 2 or more eligible members of that family, including spouse, domestic partner, dependent children or any children under a specified age which shall not exceed 19 years and any other person dependent upon the policyholder.

D.C. Code § 31-4712(a), -(b)(1)(C) (emphasis added).

75.     The insurance coverage sold pursuant to the HealthExtras Scheme did not meet the requirements of § 31-4712.  It purported to be issued as a group policy, rather than an individual policy.

76.     Upon information and belief, the District of Columbia has not approved either disability policy series C11695DBG nor Master Policy SRG 9540519 for sale to District of Columbia Consumers.  The "Description of Coverage" sent to Plaintiff in 2004 indicates the following information:

*Underwritten by:*
*National Union Fire Insurance Company of Pittsburgh, Pa.*
*a division of American International Group, Inc. (AIG)*
*(herein referred to as the Company)*
*70 Pine Street*
*New York, NY 10270*

*Policyholder:*               *AIG Group Insurance Trust, for the Account of HealthExtras*
*Master Policy Number:*   *9540-519*
*Effective Date:*           *September 1, 2004*

77.  Under the HealthExtras Scheme, instead of the policy being issued to an individual as authorized by District of Columbia law, the policy was issued to a purported trust, most recently "AIG Group Insurance Trust, for the Account of HealthExtras." These trusts, including the AIG Group Insurance Trust, were sham organizations that were formed by the Defendants and functioned as their alter egos. Upon information and belief, these sham "trust" organizations had no constitution or bylaws and the HealthExtras "members" had no voting privileges, representation, participation or involvement in these purported trusts, which were created to facilitate the HealthExtras Scheme by avoiding regulatory supervision and oversight.

78.  Although District of Columbia law prohibited any accident or sickness policy from being issued or delivered in the District unless a copy of the form of the policy has been filed with and approved by the Commissioner of the DISB, upon information and belief no such filing or approval occurred with regard to any policy at issue in this case.

79.  The HealthExtras disability policy issued by Defendants was not issued in compliance with District of Columbia law. Upon information and belief, the "AIG Group Insurance Trust, for the Account of HealthExtras" is not a group that was or is eligible to purchase group disability insurance under applicable District of Columbia law.

80.     The purported group to whom disability insurance was sold pursuant to the HealthExtras Scheme consists of persons whose only commonality is that they have a credit card and were chosen by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. and others as good marketing prospects.  The group of which the Plaintiff and other Class Members are a part of was formed by HealthExtras and the other Defendants solely to facilitate the HealthExtras Scheme.

81.     Upon information and belief, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. also marketed the disability insurance coverage in states where, as with the District of Columbia, no application was ever filed or approved by the local insurance department.

82.     The HealthExtras Scheme succeeded in allowing the Defendants to circumvent the law and gain an unprecedented and unfair advantage in the market against companies offering a legitimate disability policy.  It derived credibility from a spokesperson who was a well-liked and respected actor who had suffered a tragic accident.   That credibility was ultimately further enhanced by the participation of National Union, Alliant and Virginia Surety.  The HealthExtras Scheme targeted a large pool of potential customers who, although purportedly members of a group, in fact had no legitimate organization or entity protecting their interests and no mechanism for learning, short of becoming disabled themselves and being denied coverage, that the purported insurance coverage they were being sold was illusory and worthless.

83.     Victims of the HealthExtras Scheme had no access to the Master Policy, did not know only a tiny fraction of the money they were paying for coverage ever went to an insurance company, did not know the policy holder was a sham organization and the alter-ego and instrumentality of the perpetrators of the scheme, and did not know the purported disability insurance coverage they were purchasing was illegal, illusory and worthless.

84.     Plaintiff and others similarly situated would have had a confidential relationship of trust and confidence with a legitimate group.  By creating a sham group to facilitate the HealthExtras Scheme, Defendants assumed the obligations of that confidential relationship.

### A SCHEME OF FALSE AND DECEPTIVE ADVERTISING

85.     The HealthExtras Scheme targeted the Plaintiff and other District of Columbia residents with direct mail advertisements that included, but were not limited to the following misleading statements:

a.     "This program provides valuable protection in the event you become permanently totally disabled due to an accident."

b.     "This HealthExtras Benefit Program provides you with a $1,000,000 tax-free cash payment if you're permanently disabled due to an accident."

c.     "If an accident leaves you - the primary member - permanently disabled, you will receive a lump sum payment of $1,000,000."

d.     "After 12 months of continuing and permanent disability caused by an accident - including the inability to work - the primary member will receive a payment of $1,000,000."

e.     "You're covered with a $1,000,000 tax-free cash payment if you are permanently disabled as a result of an accident."

86.     These direct mail advertisements did not disclose that the program was illegal, fraudulent and illusory, and that harsh exclusions limited almost all claims, or that there was no intent to pay disability claims under the policy.

### THE ROLE OF DEFENDANT HEALTHEXTRAS, LLC
### IN THE HEALTHEXTRAS SCHEME

87.     HealthExtras, LLC is a limited liability company, formed and organized by officers and directors of HealthExtras, Inc., and Catalyst Health Solutions, Inc., in October 2010.

88.     In July 2012 HealthExtras, LLC, was owned and operated by Catamaran Health Solutions, LLC, as the successor corporation of HealthExtras, Inc. and Catalyst Health Solutions, Inc.   On August 1, 2012 Catamaran purportedly sold HealthExtras, LLC to a different entity. However, the president of HealthExtras, LLC, Mark Nardone, was formerly a Vice President of Catalyst Health Solutions, Inc., the corporate predecessor to Catamaran Health Solutions, LLC.

89.     Upon information and belief, the officers and directors of Catamaran HealthSolutions, LLC, sold HealthExtras, LLC in order to distance the name HealthExtras and the illegal HealthExtras Scheme from Catamaran.   Upon information and belief, the sale was performed in order to avoid liability in response to the filing of the first class action lawsuit brought against them (for the conduct complaint of herein) in the Eastern District of North Carolina in March, 2012, *Petruzzo v. National Union Fire Insurance Company of Pittsburgh, PA, et al.*, No. 5:12-cv-113-FL.

90.     Upon information and belief, since its formation in October 2010, HealthExtras, LLC has serviced, administered and collected insurance premiums from the HealthExtras Scheme. Accordingly, HealthExtras, LLC is liable to the Plaintiff for all of the same acts as its predecessors, HealthExtras, Inc., Catalyst Health Solutions, Inc. and Catamaran Health Solutions, LLC.

## DEFENDANT NATIONAL UNION'S PARTICIPATION IN THE HEALTHEXTRAS SCHEME

91.     Defendant National Union's participation in the HealthExtras Scheme includes, but is not limited to the following:

92.     Neither Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. nor HealthExtras, LLC is a licensed insurance Company anywhere.

93.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. participated in developing the policy language and determined the amount of premiums charged.

94.     The purported underwriter, National Union, accepted nominal payments to lend credibility to the HealthExtras Scheme, but did not possess any present intention to pay claims.

95.     Defendant National Union has an extensive history of violating insurance laws and regulations applicable to the sale of group insurance.

96.     On or about January 7, 2011, Defendant National Union entered into an Interim Consent Order with the Ohio Department of Insurance during the course of an examination of National Union's Accident and Health Division for the period January 1, 2008 through June 30, 2010.  The January 7, 2011 Interim Consent Order concerned the marketing of group blanket accident/sickness policies to individuals who were customers of certain banking institutions.

97.     On February 14, 2012, Defendant National Union entered into another Interim Consent Order concerning the marketing and sale of non-employer group policies for which premium rates and the classification of risks pertaining thereto had not been approved by state regulators.

98.     In September 2012, Chartis, Inc., the parent company of Defendant National Union, entered into a Multi-State Examination Regulatory Settlement Agreement on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, which superseded the Interim Consent Orders dated January 7, 2011 and February 14, 2012.  Pursuant to the Multi-State Examination Regulatory Settlement Agreement, Chartis, Inc. agreed to pay, on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, a minimum of $39 million and a maximum of $51 million in Administrative Penalties.

99.     Among the subject matters of the Multi-State Examination Regulatory Settlement Agreement were policy issuance to groups and associations and the use of trusts.

100.     Upon information and belief, National Union knew that Catamaran, f/k/a, Catalyst, f/k/a/ HealthExtras Inc. was not a licensed Insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

101.     Upon information and belief, National Union knowingly allowed Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., as well as HealthExtras, LLC to use its name on pre-printed forms from the HealthExtras offices in Rockville, Maryland to solicit consumers in the District of Columbia to buy disability insurance known as the HealthExtras Program.

102.     Upon information and belief, National Union knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" violated the District of Columbia law prohibiting accident and sickness policies from being issued other than to individuals.

103.     Upon information and belief, National Union received fees from the HealthExtras Scheme that it knew to be illegal.

## DEFENDANT AIG'S PARTICIPATION IN THE HEALTHEXTRAS SCHEME

104.     Defendant AIG's participation in the HealthExtras Scheme includes, but is not limited to the following:

105.     Upon information and belief, AIG participated in the development of the illegal trust known as the "AIG Group Insurance Trust, for the Account of HealthExtras."

106.    Upon information and belief, the sham trust called the "AIG Group Insurance Trust, for the Account of HealthExtras"  was incorporated, developed and controlled by AIG, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. and National Union.  *See* "MASTER APPLICATION FOR BLANKET ACCIDENT INSURANCE POLICY" attached hereto as **Exhibit B.**   As the Defendants have issued the Master Policy to themselves as the "Policyholder," this allegation is made upon information and belief because the information necessary to specifically identify all of the Defendants' interests and ownership of the "AIG Group Insurance Trust, for the Account of HealthExtras" is within the exclusive control of Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., AIG and National Union.  Therefore, these facts are alleged upon information and belief based on the name of the trust as indicated on the Description of Coverage and the MASTER APPLICATION.  Additional discovery is needed to fully understand the "AIG Group Insurance Trust, for the Account of HealthExtras," and its owners and incorporators.

107.    Upon information and belief, AIG has received a portion of the illegal insurance premiums paid by Plaintiff for the HealthExtras Scheme.

108.    Upon information and belief AIG participated in the HealthExtras Scheme with knowledge that it was illegal.

## THE ALLIANT DEFENDANTS' PARTICIPATION IN THE HEALTHEXTRAS SCHEME

109.    The Alliant Defendants' participation in the HealthExtras Scheme includes, but is not limited to the following:

110.    The purported Broker of Record,  Alliant, as corporate predecessor to The Sklover

Group, Inc, and JLT Services Corporation, accepted nominal payments to lend its name and credibility to the HealthExtras Scheme and to create the illusion of a valid solicitation of a disability insurance policy.

111.    Upon information and belief, Alliant knew that HealthExtras Inc., now Catamaran Health Solutions, LLC was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

112.    Upon information and belief, Alliant allowed HealthExtras Inc., now Catamaran Health Solutions, LLC, as well as HealthExtras, LLC to use its name on pre-printed forms from the HealthExtras offices in Rockville, Maryland  to solicit consumers in the District of Columbia to buy disability insurance known as the HealthExtras Program.

113.    Upon information and belief, Alliant knew that the underwriters of the HealthExtras Program had no intent to pay claims.

114.    Upon information and belief, Alliant knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" did not constitute a valid group under District of Columbia law.

115.    Upon information and belief, Alliant received fees from the HealthExtras Scheme it knew to be illegal.

## DEFENDANT VIRGINIA SURETY'S PARTICIPATION IN THE HEALTHEXTRAS SCHEME

116.    Defendant Virginia Surety's participation in the HealthExtras Scheme includes, but is not limited to the following:

117.    Upon information and belief, Virginia Surety, the underwriter for the TwoThousand Five Hundred  ($2,500.00) Out of Area Emergency Accident and Sickness Medical

Expense Benefit in the HealthExtras Program accepted nominal payments to lend its name and ad credibility to the HealthExtras Scheme.

118.    Upon information and belief, Virginia Surety knew HealthExtras Inc., now Catamaran Health Solutions, LLC was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

119.    Upon information and belief, Virginia Surety knowingly allowed HealthExtras Inc., now Catamaran Health Solutions, LLC, as well as HealthExtras, LLC to use its name on pre-printed forms from  the HealthExtras offices in Rockville Maryland  to solicit consumers in Michigan to buy disability insurance known as the HealthExtras Program.

120.    Upon information and belief, Virginia Surety knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" did not constitute a valid group under District of Columbia law.

121.    Upon information and belief, Virginia Surety received fees from the HealthExtras Scheme that it knew to be illegal.

### JOINT ENTERPRISE AND CONSPIRACY TO DECIVE THE PUBLIC AND VIOLATE DISTRICT OF COLUMBIA LAW

122.    All Defendants engaged in a joint enterprise and conspiracy to utilize their efforts to sell, broker, underwrite, collect, allocate and share premiums derived from the HealthExtras disability program to Plaintiffs and the putative Class Members, for their own individual and mutual benefit, without fully disclosing to Plaintiff and the putative Class Members that the policies being sold to them did not and could not comply with District of Columbia law, and said lack of compliance was material information about such policies.

123.    Defendants engaged in agreements for a common purpose, a common pecuniary

interest, and a joint venture to share illegal profits and all Defendants engaged in at least one act in furtherance of the illegal HealthExtras scheme.

124.     As a result, the Defendants are jointly and severally liable for any and all damages or restitution the Plaintiff and Class Members are entitled to recover in this action.

## FIRST CAUSE OF ACTION

### Unjust Enrichment

125.     Plaintiff realleges and incorporates by reference each of the factual allegations above as if set forth herein.  This count is pled in the alternative to Count II.

126.     Defendants have been and continue to be enriched by their acts and omissions alleged herein.

127.     These deceptive acts and omissions allow Defendants to obtain millions of dollars from District of Columbia residents that would not have been gained, but for Defendants' acts and omissions.

128.     Plaintiff and the proposed Class Members unknowingly purchased illegal, unapproved, and virtually worthless insurance and paid Defendants an amount that far exceeds the value of the insurance product identified herein as a result of Defendants' acts and omissions.

129.     Plaintiff and the Class Members suffered damages due to the Defendants' acts and omissions as alleged herein.

130.     Defendants have and continue to be unjustly enriched as a result of their deceptive acts and omissions.

131.     Defendants lack any legal justification for engaging in a course of deceptive acts and omissions as alleged herein at Plaintiff's and the Class's expense.

132.    No other remedy at law can adequately compensate Plaintiff and the Class Members for the damages occasioned by Defendants' conscious and willful choice to engage in a course of deceptive acts and omissions.

133.    When seeking to purchase accidental disability insurance and emergency accident and sickness insurance, Plaintiff and the putative Class Members have a choice of various underwriters, coverage amounts and coverage terms.

134.    Plaintiff and similarly situated District of Columbia residents purchased coverage due to its relatively low price point, its high coverage amount and other market based factors, including the marketing and likeness of HealthExtras spokesperson, Christopher Reeve.

135.    Plaintiff and the putative Class Members purchased their HealthExtras disability insurance in order to protect themselves should they suffer disability as a result of an accidental injury or accident or sickness while traveling.  However, the actual HealthExtras policy is virtually worthless and illegal.

136.    Defendants, individually and collectively, failed to disclose that the insurance coverage being sold to Plaintiff and the putative Class Members was illegal under District of Columbia law in that Plaintiff and the putative Class Members were not members of a lawful "blanket group."

137.    By purchasing the HealthExtras program that included the component policies and paying fees and premiums, Plaintiff and the putative Class Members conferred a benefit upon the Defendants, without knowledge that the purchased coverage was illegal and void.

138.    Defendants knowingly accepted and retained this non-gratuitous benefit conferred upon them by Plaintiff and the putative Class Members despite Defendants' knowledge the subject policies were illegal as a matter of District of Columbia law for the reasons enumerated herein.

139.    Plaintiff and the putative Class Members have spent and continue to spend thousands of dollars in premium payments for illegal policies that could never be lawfully sold to District of Columbia residents.

140.    The Defendants have been unjustly enriched in retaining the payments paid by Plaintiff and the putative Class Members for the Accidental Permanent and Total Disability coverage and the Emergency Accident and Sickness Benefit insurance coverage.

141.    The Defendants' retention of the non-gratuitous benefit conferred by Plaintiff and the putative Class Members under these circumstances is unjust and inequitable.

142.    No other remedy at law can adequately compensate Plaintiff and the putative Class Members for the economic damages resulting from Defendants' wrongful actions as alleged herein.

143.    Because Defendants' retention of the non-gratuitous benefit conferred upon them by Plaintiff and the putative Class Members is unjust and inequitable, Defendants must pay restitution in the form of disgorgement of all revenues, earnings, profits, compensation and benefits which District of Columbia residents have paid to the conspirators as a result of such business acts and practices.

## SECOND CAUSE OF ACTION

### Breach of the Duty of Good Faith and Fair Dealing

144. Plaintiff realleges and incorporates by reference each of the factual allegations above as if set forth herein.

145. Defendants have breached the duty of good faith and fair dealing to Plaintiff, and similarly situated District of Columbia residents, by engaging in the conduct set forth herein.

146. Defendants, individually and collectively, knew the HealthExtras disability policy could only be issued to individuals under District of Columbia law, and that the HealthExtras disability policies were instead sold to a sham "group," using the guise of insurance trusts.

147. Despite Defendants' collective knowledge, Defendants failed to reveal to Plaintiff, and other similarly situated District of Columbia residents, that their HealthExtras disability policies were illegal and of little value; their premiums were thus illegal and not approved; they paid for illegal policies; and they were not part of any lawful blanket group under District of Columbia law.

148. Despite this duty, Defendants sold illegal HealthExtras insurance policies, collected premiums therefore and shared the monies derived there from Plaintiff, and other similarly situated District of Columbia residents and thus breached the duty of good faith and fair dealing as a matter of law. This breach proximately caused damages to Plaintiff, and other similarly situated District of Columbia residents.

149. Plaintiff, and other similarly situated District of Columbia residents, have been proximately injured as a result of the Defendants' breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused them by said breach.

### THIRD CAUSE OF ACTION

**Conversion**

150.    Plaintiff realleges and incorporates by reference each of the factual allegations above as if set forth herein.

151.    Defendants, individually and collectively, contracted with the Plaintiff, and other similarly situated District of Columbia residents, to pay a premium for insurance coverage. Defendants unilaterally increased that premium and debited Plaintiff's, and other similarly situated District of Columbia residents', accounts for more than the contractual obligation.

152.    By their actions, the Defendants have appropriated the Plaintiff's, and other similarly situated District of Columbia residents', property to their own use and benefit beyond that which the contract calls for.

153.    This exercise of dominion and control over Plaintiff's, and other similarly situated District of Columbia residents', funds debited outside the terms of the agreement, was an intentional act and in defiance of Plaintiff's, and other similarly situated District of Columbia residents',  true rights.

154.    Defendants individually and collectively have converted Plaintiff's, and other similarly situated District of Columbia residents', funds and that by this conversion, Plaintiff, and other similarly situated District of Columbia residents, have been injured and damaged by this conversion and the taking of the funds.

## FOURTH CAUSE OF ACTION

**Violation of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.***

155.    Plaintiff realleges and incorporates by reference each of the factual allegations above as if set forth herein.

156.    D.C. Code § 28-3904(a) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have."

157.    Defendants violated D.C. Code § 28-3904(a) by representing to consumers that the HealthExtras program was a valid group disability insurance program, when in fact it was prohibited by District of Columbia law; by representing that consumers' premiums were intended to pay for insurance, when in fact only a tiny fraction of the premiums was paid to an insurance company; and by representing that the HealthExtras program provided actual, valuable coverage, when in fact the coverage was illusory and virtually worthless.

158.    D.C. Code § 28-3904(d) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to  represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another."

159.    Defendants violated D.C. Code § 28-3904(d) by representing to consumers that the HealthExtras program was a valid group disability insurance program, when in fact it was prohibited by District of Columbia law; by representing that consumers' premiums were intended to pay for insurance, when in fact only a tiny fraction of the premiums was paid to an insurance

company; and by representing that the HealthExtras program provided actual, valuable coverage, when in fact the coverage was illusory and virtually worthless.

160.    D.C. Code § 28-3904(e) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to misrepresent as to a material fact which has a tendency to mislead."

161.    Defendants violated D.C. Code § 28-3904(e) by representing to consumers that the HealthExtras program was a valid group disability insurance program, when in fact it was prohibited by District of Columbia law; by representing that consumers' premiums were intended to pay for insurance, when in fact only a tiny fraction of the premiums was paid to an insurance company; and by representing that the HealthExtras program provided actual, valuable coverage, when in fact the coverage was illusory and virtually worthless.

162.    D.C. Code § 28-3904(e-1) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

163.    Defendants violated D.C. Code § 28-3904(e-1) by representing to consumers that the HealthExtras program was a valid group disability insurance program, when in fact it was prohibited by District of Columbia law; by representing that consumers' premiums were intended to pay for insurance, when in fact only a tiny fraction of the premiums was paid to an insurance company; and by representing that the HealthExtras program provided actual, valuable coverage, when in fact the coverage was illusory and virtually worthless.

164.   D.C. Code § 28-3904(f) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to fail to state a material fact if such failure tends to mislead."

165.   Defendants violated D.C. Code § 28-3904(f) by concealing from consumers that the HealthExtras program was prohibited by District of Columbia law, that only a tiny fraction of consumers' premiums were paid to an insurance company, and that the coverage provided under the HealthExtras program was illusory and virtually worthless.  Additionally, Defendants violated D.C. Code § 28-3904(f) by concealing from consumers the terms of the Master Policy SRG 9540519 that governed their HealthExtras insurance coverage.

166.   D.C. Code § 28-3904(f-1) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to use innuendo or ambiguity as to a material fact, which has a tendency to mislead."

167.   Defendants violated D.C. Code § 28-3904(f-1) by deliberately obscuring the interrelationships among the Defendant entities, and by implying in marketing materials and other communications that various Defendants were licensed insurance companies, when in fact they were not.

168.   D.C. Code § 28-3904(h) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered."

169.   Defendants violated D.C. Code § 28-3904(h) by advertising the HealthExtras program without the intention to provide coverage or pay claims as advertised.

170.   D.C. Code § 28-3904(q) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement, or other evidence of indebtedness which the consumer may execute."

171.   Defendants violated D.C. Code § 28-3904(q) by failing to supply to consumers copies of the Master Policy SRG 9540519 that governed their HealthExtras insurance coverage.

172.   D.C. Code § 28-3904(r) makes it a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to make or enforce unconscionable terms or provisions of sales or leases."

173.   Defendants violated D.C. Code § 28-3904(r) by charging premiums far in excess of the negligible value of the HealthExtras insurance coverage; by providing coverage that was illusory and virtually worthless; by subjecting consumers to the terms of the Master Policy SRG 9540519 that governed their HealthExtras insurance coverage, without ever allowing consumers to see the policy and ascertain its terms; and by unilaterally increasing the HealthExtras premium and debiting Plaintiff's, and other similarly situated District of Columbia residents', accounts for more than the contractual obligation.

174.   D.C. Code § 28-3905(k)(1)(A) allows a consumer to bring a CPPA claim "seeking relief from the use of a trade practice in violation of a law of the District."

175.   Defendants violated a law of the District by administering the HealthExtras program as a purported group insurance program, in violation of D.C. Code § 31-4712's requirement that accident and sickness insurance policies be issued as individual policies.  Upon information and belief, Defendants violated a law of the District by selling HeathExtras insurance

41

coverage in the District without seeking or obtaining approval from the Commissioner of the Department of Insurance, Securities, and Banking.  These practices constitute predicate violations of the CPPA, giving rise to a right of action under D.C. Code § 28-3905(k)(1)(A).

176.    Plaintiff, and other similarly situated District of Columbia residents, have been injured as a result of the Defendants' violations of the CPPA and are thus entitled to treble damages or $1500 per violation (whichever is higher), injunctive relief, equitable relief, punitive damages, attorneys' fees and costs of this suit, and any other further relief as justice may require.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all Class Members, demand judgment against Defendants as follows:

(a)    Certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class Members;

(b)    Declaring the HealthExtras disability policy illegal under District of Columbia law and against public policy;

(c)    Awarding damages in the form of actual damages, treble damages, statutory damages, and/or punitive damages against Defendants in favor of Plaintiff and putative Class Members in an amount to be determined by the Court as fair and just given Defendants' wrongful conduct;

(d)    Awarding injunctive relief in the form of an Order prohibiting Defendants from engaging in further unlawful activities in the District of Columbia or an order of such other non-monetary relief as may be necessary and proper;

(e)     Awarding reasonable attorneys' fees, expenses and costs, including costs of

investigation reasonably incurred; and

(f)     Awarding such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all claims so triable in this action.


Dated:  May 27, 2014.                          Respectfully submitted,

                                               /s/ *Robert O. Wilson*
                                               Tracy D. Rezvani (D.C. Bar No. 464293)
                                               Robert O. Wilson (D.C. Bar No. 1005987)
                                               **REZVANI VOLIN & ROTBERT P.C**
                                               1050 Connecticut Avenue NW, 10th Floor
                                               Washington, D.C. 20036
                                               Phone:  (202) 350-4270
                                               Fax:  (202) 351-0544
                                               rwilson@rvrlegal.com
                                               trezvani@rvrlegal.com

                                               *Counsel for Plaintiff*

**OF COUNSEL:**

Aaron C. Hemmings
**HEMMINGS & STEVENS, PLLC**
5613 Duraleigh Road, Suite 151
Raleigh, North Carolina 27675
Phone:  (919) 277-0161
Fax:  (919) 277-0162
ahemmings@hemmingsandstevens.com

Jay Aughtman
**AUGHTMAN LAW FIRM, LLC**
1772 Platt Place
Montgomery Alabama 36117
Phone:  (334) 215-9873
Fax:  (334) 213-5663
jay@aughtmanlaw.com