### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| RITA CAMPBELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-0892 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 35, 36, 37, 38 |
| | : | | |
| NATIONAL UNION FIRE INSURANCE | : | | |
| COMPANY OF PITTSBURGH, PA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

#### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

## I.  INTRODUCTION

From 2000 through 2014, Plaintiff Rita Campbell was enrolled in the HealthExtras

benefit program, which purported to provide her with group disability insurance coverage.  Ms.

Campbell now believes that the policy she paid for was illegal and worthless, and she has

brought this putative class action on behalf of herself and similarly situated residents of the

District of Columbia against seven companies that she believes contributed to and profited from

the sale of illusory insurance policies.  Ms. Campbell never submitted a claim for coverage and is

no longer enrolled in the program, but she seeks to recover her premium payments and damages,

alleging that Defendants sold her insurance coverage that they never intended to honor, charged

her premiums in excess of her contractual obligation, and failed to provide truthful information

about the program.  In her five-count complaint, Ms. Campbell asserts numerous violations of

the D.C. Consumer Protection Procedures Act ("CPPA"), and she alleges that Defendants either

breached their contractual obligations or, alternatively, that Defendants are liable for unjust

enrichment, conversion, and money had and received.  In their motions to dismiss, Defendants

argue that Ms. Campbell lacks standing because her insurance policy was enforceable under D.C. law and she suffered no injury, that her claims are barred by the applicable statutes of limitations, and that in any event, she has failed to plead fraud with particularity and failed to state a claim for relief.  Upon consideration of the motions to dismiss, and the memoranda in support thereof and opposition thereto, the Court will grant in part and deny in part the Defendants' motions to dismiss.

## II.  FACTUAL ALLEGATIONS

This case marks one of at least eleven closely related actions filed across the country seeking to recover premium payments and damages in relation to the HealthExtras benefit program ("the program"), which plaintiffs in each case allege was marketed and sold to them in violation of state law.[1]  This particular action focuses on allegations that Defendants advertised and purported to sell disability insurance coverage through the HealthExtras benefit program to

---

[1] *See, e.g., Petruzzo v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 5:12-cv-00113-FL (E.D.N.C.) (filed March 6, 2012 and dismissed for lack of standing on May 22, 2015); *Walker, et al. v. Stonebridge Life Ins., et al.*, No. 3:13-cv-04189-B (N.D. Tex.) (filed Oct. 16, 2013, dismissed by plaintiffs on July 1, 2014); *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 2:13-cv-06272-FSH-MAH (D.N.J.) (filed Oct. 21, 2013, motions to dismiss currently pending); *Waiserman v. National Union Fire Insurance Company of Pittsburgh, PA, et al.*, No. 2:14-cv-00667-SVW-CW (C.D. Cal.) (filed Jan. 28, 2014, dismissed for lack of injury-in-fact on October 24, 2014); *Williams, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No.1:14-cv-00309-TWT (N.D. Ga.) (filed Feb. 3, 2014, motions for summary judgment currently pending); *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 6:14-cv-00870-BHH (D.S.C.) (filed March 12, 2014, motions to dismiss denied March 31, 2015); *Broome, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 2:14-cv-00156-RLJ (E.D. Tenn.) (filed May 27, 2014, dismissed on plaintiffs' motion on June 24, 2015); *Riefer, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 1:14-cv-21958-KMM (S.D. Fla.) (filed May 27, 2014 and dismissed by plaintiffs on August 22, 2015); *Watson, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., et al.*, No. 2:14-cv-01312-MVL-DEK (E.D. La.) (filed June 6, 2014, motions to dismiss currently pending); *Graham v. Catamaran Health Solutions LLC, et al.*, No. 4:14-cv-00589-BRW (E.D. Ark.) (filed October 6, 2014, motions to dismiss currently pending).

D.C. residents while violating D.C. insurance laws and without any intent to provide the paid-for coverage.

In 1999 or 2000, Ms. Campbell received marketing materials about the HealthExtras benefit program from Defendant HealthExtras, Inc., now known as Catamaran Health Solutions, LLC ("Catamaran").[2]  *See* 1st Am. Compl. ¶ 53, ECF No. 29.  Catamaran had paid the actor Christopher Reeve to serve as the face of its marketing campaign, and it reached potential customers by entering into agreements with credit card companies that allowed Catamaran to access cardholders' financial information and to send marketing flyers to selected cardholders along with their credit card statements.  *Id.* ¶¶ 41, 47.  Ms. Campbell expressed interest in the program, which included disability insurance packaged together with an out of area emergency accident and sickness medical expense benefit.  *Id.* ¶¶ 56, 66.  As a result, Catamaran mailed her a program description along with a letter advertising coverage in the form of a "$1,000,000 cash payment if you are permanently disabled due to an accident," and "$2,500 a year in reimbursements for coinsurance and deductibles for healthcare expenses when you are travelling."  *Id.* ¶ 56.

Ms. Campbell then enrolled in the program and agreed to pay premiums on a monthly or annual basis, with her premiums being charged to her credit card.  *Id.* ¶¶ 60, 63.  Catamaran's Member Services subsequently sent Ms. Campbell an enrollment letter commending her for "hav[ing] armed [her]self with one of the most exciting and affordable disability plans found anywhere in America today."  *Id.* ¶ 61.  The enrollment confirmation letter also bore Christopher

---

[2] Ms. Campbell alleges that the marketing materials she received were from HealthExtras, Inc., 1st Am. Compl. ¶ 53, which subsequently changed its name to Catalyst Health Solutions, Inc., and then merged with SXC Health Solutions to form Catamaran, *id.* ¶ 7. For clarity, the Court refers to Defendant Catamaran Health Solutions, LLC, f/k/a Catalyst Health Solutions, Inc., f/k/a HealthExtras, Inc., as "Catamaran" throughout the opinion.

Reeve's picture and attributed to him the statement that "[b]ecause lives can change in an instant, as mine did, you should have the additional security for yourself and your family that HealthExtras can provide." *Id.*

Defendant Virginia Surety Company, Inc. ("Virginia Surety") served as the underwriter for Ms. Campbell's $2,500 medical expense benefit during the entire period of her enrollment. *Id.* ¶ 68. Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") replaced non-party Federal Insurance Company as the underwriter of her disability insurance policy effective January 1, 2005. *Id.* ¶¶ 47(i), 67. Ms. Campbell also alleges that Catamaran effectively acted as an underwriter for her disability insurance policy as of July 2000, when it agreed with "at least one insurer" that Catamaran would "pay disability benefits to any person who does not qualify as permanently disabled, but who is nonetheless unable to perform the material and substantial duties of such person's regular occupation." *Id.* ¶ 125.

Because Catamaran was not a licensed insurance broker in the District of Columbia, the company paid "real licensed broker[s]," like Defendant Alliant Services Houston, Inc. ("Alliant Services"), to use their names on correspondence and program documents. *Id.* ¶ 58. The Program Summary that Ms. Campbell received from Catamaran identified Alliant Services' corporate predecessor as the "Program Administrator," and her payment notices listed Alliant Services as the "Broker of Record." [3] *Id.* ¶ 9.

---

[3] Also named as a Defendant in this case is Alliant Insurance Services Inc. ("Alliant Insurance"), *id.* ¶ 8, which seeks dismissal of all claims against it on the ground that it is not a proper party to this suit. Alliant Mem. Supp. Mot. Dismiss at 4, ECF No. 35-1. The Court agrees and will grant the motion. Ms. Campbell asserts that Alliant Insurance is a national insurance distributor "operating through a national network of offices." 1st Am. Compl. ¶ 8. Upon information and belief, she also alleges that one of Alliant Insurance's offices is located in Houston, Texas at the same address as an Alliant Services office, and that Alliant Insurance's website listed job opportunities at Alliant Services. *Id.* But the complaint offers no factual allegations of any kind connecting Alliant Insurance to the benefit program in question, and the

In 2004, Ms. Campbell received a "Description of Coverage" and "Accident Protection Plan Program Summary" for her disability policy series C11695DBG. *Id.* ¶ 70. The description of her policy contained "extremely restrictive, conflicting and confusing terms and exclusions which renders any disability insurance 'coverage' virtually worthless to consumers and is in sharp contrast to . . . representations made in the marketing material" she had previously received. *Id.* ¶¶ 70–75, 103–05. Specifically, Ms. Campbell asserts that the policy exclusions contradicted Defendants' marketing materials that had advertised "valuable protection," "a $1,000,000 tax-free cash payment if you are permanently disabled due to an accident," and a $1,000,000 payment "[a]fter 12 months of continuing and permanent disability caused by an accident—including the inability to work." *Id.* ¶¶ 103–05.

The materials that Ms. Campbell received in 2004 also stated that "if any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540519 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases." *Id.* ¶ 70. But Ms. Campbell claims that "she has <u>never</u> been provided a copy of Master Policy SRG 9540519," and she suspects that "[w]hat little coverage escapes C11695DBG

---

fact that the company may have some corporate relationship to a named Defendant does not indicate the existence of a plausible claim against Alliant Insurance. In her opposition, Ms. Campbell alleges for the first time that Alliant Insurance "served as the conduit by which Alliant Houston, its subsidiary, operated and distributed its portion of the HealthExtras Scheme in the District." Pl.'s Opp'n at 45, ECF No. 43. It is well-established, however, that a plaintiff cannot amend her compliant via argument in an opposition brief. *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."). Although Ms. Campbell argues that her claims should not be stymied "by the difficulty in easily identifying the precise role played by each of the two Alliant entities in the HealthExtras scheme," Pl.'s Opp'n at 43, the "doors of discovery" do not unlock "for a plaintiff armed with nothing more than conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). In the absence of any factual allegations supporting a claim against Alliant Insurance, the Court must dismiss all claims against the company.

may be further trumped and negated by Master Policy SRG 9540519." *Id.* ¶¶ 71, 76.  Ms. Campbell notes that "[a]lthough the coverage description disclosed some limitations on the policy . . . [no] Defendant[s] disclosed . . . [that] there was no intention to pay disability benefits that fell within the terms of coverage." *Id.* ¶¶ 81–82.

In fact, Ms. Campbell claims, Catamaran, National Union, and Defendant American International Group, Inc. ("AIG") developed the policies in question "with no intent to pay ever [sic] disability claims and the specific intent to deny any disability claims made by victims of the HealthExtras Scheme." *Id.* ¶ 107.  Public records show that an individual in California who was rendered a quadriplegic had his claim denied by National Union, and that another individual in South Carolina had his claim denied by National Union after he was rendered a paraplegic. *Id.* ¶ 111.  "Upon information and belief," Ms. Campbell further asserts that "there are thousands of these unfair and unconscionable denials which are not in the public record." *Id.* ¶ 114.

Although Ms. Campbell alleges that she was never provided with a copy of the governing Master Policy, on an unspecified date, she did receive the "Master Application for Blanket Accident Insurance Policy" for Master Policy 9540519.[4]  Master Application, Pl.'s Ex. B at 2–3, ECF No. 29-2.  The Master Application is printed on letterhead naming National Union and Defendant AIG, doing business as AIG Group Insurance Trust, ("AIG" or "the Trust").  1st Am. Compl. ¶ 77.  The document describes a policy with an effective date of September 2004, names the Trust as the policyholder, and includes policy riders and endorsements that list the policyholder as "HealthExtras." *Id.* ¶ 77.  From these facts, Ms. Campbell concludes that the

---

[4] Catamaran argues in its reply brief that the "Master Application" attached to Ms. Campbell's complaint is, in fact, the Master Policy she claims never to have received, and that she knew as much long before filing her complaint.  Catamaran's Reply at 14 n.4, ECF No. 47. But at the motion to dismiss stage, the Court must credit Ms. Campbell's contrary factual allegation that she has never received the Master Policy in question.

Trust was created by National Union, AIG, and Catamaran. *Id.* "[U]pon information and belief," Ms. Campbell further alleges that the corporate defendants issued a Master Policy to themselves that they did not disclose to group members, and that they "are in fact the alter-ego of" the Trust. *Id.* at ¶¶ 73–74, 77.

She asserts that the Trust is a "sham organization[]," that it does not constitute a "group that was or is eligible to purchase group disability insurance under District of Columbia law," and that the Trust was created so that Defendants could "avoid[] regulatory supervision and oversight." *Id.* ¶¶ 93, 95, 97.  Defendants purported to sell group insurance so that they were able to issue a single, Master Policy to themselves.  *See id.* ¶¶ 89, 93.  Individual insureds were provided only with certificates of insurance that summarized their coverage terms and rights under the Master Policy, which Defendants did not provide.  *See id.* ¶ 89.  "Because there was no legitimate group, there was no one to look out for the interests of the persons paying for the purported disability coverage," and policy-holders had "no mechanism for learning, short of becoming disabled themselves and being denied coverage, that the purported insurance coverage they were being sold was illusory and worthless." *Id.* ¶¶ 45, 100.

Specifically, Ms. Campbell alleges that Defendants issued her policy in violation of D.C. Code § 31-4712, which forbids the issuance of group accident and sickness insurance policies without prior approval from the Commissioner of the D.C. Department of Insurance, Securities and Banking ("DISB").  *Id.* ¶¶ 90–95.  She also claims that Defendants violated a number of DC insurance regulations, including those prohibiting solicitation by credit card and forbidding the use of insurance premiums to pay rebates. *Id.* ¶¶ 84–88.

Ms. Campbell further alleges that Defendants' marketing materials for the program failed to disclose that less than 15% of the premiums that she paid for disability coverage actually went

to the underwriter, National Union. *Id.* ¶¶ 79–80. As a consequence, she believes that "[r]oughly 80% of the insurance premiums paid to the HealthExtras [program] by the Plaintiff has been collected by [Catamaran] and has not paid for insurance coverage or paid for anything that would benefit the Plaintiff." *Id.* ¶ 80. Ms. Campbell also complains that Defendants' "direct mail advertisements did not disclose that the program was illegal, fraudulent and illusory, and that harsh exclusions limited almost all claims, or that there was no intent to pay disability claims under the policy." *Id.* ¶ 112.

On at least two unspecified dates during the fourteen-year period that Ms. Campbell was enrolled in the program, her premiums were increased "without the approval of DISB," and she was charged an amount that exceeded her contractual obligation without her authorization. *Id.* ¶¶ 27, 65. On August 1, 2012, Catamaran transferred Ms. Campbell's disability policy to Defendant HealthExtras LLC,[5] which thereafter "service[d], administer[ed], collect[ed] and allocate[d] the premiums," *id.* ¶ 11, until the benefit program was terminated at the conclusion of 2014, Notice of Policy Terminations, Pl.'s Ex. A, ECF No. 43-1.

Ms. Campbell asserts that "each Defendant received money and profited from the illegal" program. 1st Am. Compl. ¶ 117. Specifically, she alleges that Catamaran and HealthExtras LLC collected her premium payments, *see id.* ¶ 123, underwriters National Union and Virginia Surety and broker Alliant Services all received "nominal payments" to lend their names to the scheme, *id.* ¶¶ 131, 150, 157, and AIG, which developed and controlled the Trust named as the policyholder, "received a portion of the illegal insurance premiums paid by Plaintiff," *id.* ¶ 147.[6]

_____

[5] HealthExtras LLC filed a petition for bankruptcy on January 9, 2015, triggering an automatic stay of this case as it pertains to that Defendant. *See* Suggestion of Bankruptcy, ECF No. 49; *see also In re HealthExtras, LLC*, No. 15-10368 (Bankr. D. Md.).

[6] AIG appears to have overlooked this allegation and others claiming that its name appeared in the description of coverage, an enrollment letter, payment due notices and other

In May 2014, a few months before her coverage was terminated, Ms. Campbell initiated this putative class action by filing a complaint on her own behalf and on behalf of similarly situated residents of D.C. who participated in the HealthExtras program. *See generally* Compl., ECF No. 1. After Defendants filed motions to dismiss the matter, Ms. Campbell rendered the motions moot by filing a first amended complaint in August 2014. *See generally* 1st Am. Compl.

Count I of the amended complaint asserts a claim of unjust enrichment based primarily on the allegation that Defendants profited from the sale of "illegal and void" coverage that was worthless to purchasers. *Id.* ¶¶ 167–84. Count II alleges that Defendants breached the terms of their contracts and the duty of good faith and fair dealing by charging Ms. Campbell more than her contractual obligation and by selling HealthExtras policies while failing to reveal that they were "illegal and of little value." *Id.* ¶¶ 186–94. Count III is a claim of conversion premised on Defendants raising her premium and charging her more than her contractual obligation. *Id.* ¶¶ 196–200. Count IV asserts numerous violations of the CPPA, *id.* ¶¶ 202–27, and Count V is a claim of money had and received also based on the unauthorized premium increases, *id.* ¶¶ 229–33. As relief, Ms. Campbell seeks a declaration that the disability policy is illegal, an award of actual damages, treble damages, statutory damages, and punitive damages, an injunction prohibiting Defendants from engaging in unlawful activities in D.C., and attorneys' fees, costs, and expenses. *Id.* at 60. She also seeks "restitution in the form of disgorgement of all revenues,

---

program-related documents when arguing that Ms. Campbell's claims against it should be dismissed because she alleges only that AIG owns National Union and has failed to allege any facts suggesting that she had any interactions with AIG. *See* Nat'l Union & AIG Mem. Supp. Mot. Dismiss at 3, ECF No. 37-1. AIG may dispute the accuracy of these allegations or their meaning, but because the Court finds that the argument that Ms. Campbell has not pled facts pertaining to interactions with AIG is contradicted by the complaint, it will deny AIG's motion to dismiss all claims against it on that basis.

earnings, profits, compensation and benefits which District of Columbia residents have paid

. . . ." *Id.* ¶ 184.

Defendants now seek to dismiss all claims pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6), arguing that Ms. Campbell lacks standing, that her claims are barred by

the applicable statutes of limitations, that she has failed to plead fraud with particularity, and that

she has failed to state a plausible claim for relief.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

The D.C. Circuit has explained that a motion to dismiss for lack of standing constitutes a

motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because "the defect of

standing is a defect in subject matter jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.

Cir. 1987).  Federal courts are courts of limited jurisdiction, and the law presumes that "a cause

lies outside this limited jurisdiction . . . ."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

375, 377 (1994); *see also Gen. Motors Corp. v. E.P.A.*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As

a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  It is

the plaintiff's burden to establish that the court has subject matter jurisdiction.  *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the

Court must give the plaintiff's factual allegations closer scrutiny than would be required for a

12(b)(6) motion for failure to state a claim.  *See Grand Lodge of Fraternal Order of Police v.

Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001).  Thus, the court is not limited to the

allegations contained in the complaint.  *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C.

Cir. 1987).  Instead, "where necessary, the court may consider the complaint supplemented by

undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C.

Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

## B. Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain

statement of the claim" in order to give the defendant fair notice of the claim and the grounds

upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

(per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate

likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim.

*See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v.

Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the

complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See,

e.g., United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not

necessary for the plaintiff to plead all elements of a prima facie case in the complaint. *See

Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25,

28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements," are

therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555. In deciding a motion to dismiss under Rule 12(b)(6), the Court may take judicial notice of facts litigated in a prior related case. *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49–50 (D.D.C. 2012).

Where a claim of fraud or mistake is alleged, the "short and plain statement" requirement of Rule 8(a) is joined by the "particularized" pleading standards of Rule 9. Federal Rule of Civil Procedure 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must therefore "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). Rule 9(b), in other words, "requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)).

## IV. ANALYSIS[7]

### A. Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants first argue that this matter must be dismissed pursuant to Federal Rule of

Civil Procedure 12(b)(1) because Ms. Campbell "fails to allege an injury-in-fact to support

Article III standing." Catamaran's Mot. Dismiss at 1–2, ECF No. 36.[8] In short, Defendants

claim that Ms. Campbell's suit is premised on the hypothesis "that *if* she had become disabled

and submitted a covered claim for benefits, Defendants *would* have wronged her by denying it."

Catamaran's Mem. Supp. Mot. Dismiss at 14, ECF No. 36-1. Defendants argue that such

"speculative, counterfactual" claims are insufficient to establish standing. *Id.* In response, Ms.

Campbell asserts that she has adequately alleged three injuries in fact sufficient to establish

standing: (1) she paid premiums for insurance that she would not have purchased "had she

known that Defendants had no present intention to pay claims covered by such insurance," (2)

she was debited "premiums higher than contractually permitted for the insurance product," and

(3) as to her CPPA claim, Defendants violated her statutory right "to truthful information from

merchants about consumer goods and services that are or would be purchased, leased, or

received in the District of Columbia."[9] Pl.'s Opp'n at 55–57, ECF No. 43 (internal quotation

marks omitted). The Court considers each alleged injury in turn.

---

[7] Ms. Campbell asserts and Defendants appear to agree that District of Columbia law governs this action. "Because litigants may waive choice-of-law issues, the Court need not challenge that assumption." *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111 n.2 (D.D.C. 2010).

[8] All other Defendants have joined or incorporated Catamaran's motion.

[9] Although Ms. Campbell's sixty-page complaint, spanning 223 paragraphs of allegations, could perhaps be viewed as alleging other forms of injury, she has consistently argued that her adequately-alleged injuries are the three listed here. *See* Pl.'s Opp'n at 55–61; Pl.'s Response at 2–4, ECF No. 56. Ms. Campbell is represented by counsel and is not proceeding *pro se*, so the Court will limit its analysis to the arguments presented. *See Ronkin v. Vihn*, 71 F. Supp. 3d 124, 133 n.7 (D.D.C. 2014) ("While it is possible that the plaintiff alludes to this issue, given the fact that she is represented by an attorney and is not proceeding *pro se*,

As Ms. Campbell readily acknowledges, to demonstrate standing, she must "have suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 53 (citing *Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 73 (D.D.C. 2013)). Such a showing is part of "the irreducible constitutional minimum of standing," so to survive a motion to dismiss, a plaintiff must have produced at least "general factual allegations of injury resulting from the defendant's conduct." *Defenders of Wildlife*, 504 U.S. at 560, 561 (internal quotation marks and citations omitted).

When assessing standing at this stage of litigation, the Court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but it will "not assume the truth of legal conclusions, nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, No. 14-5325, 2015 WL 4772774, at *6 (D.C. Cir. Aug. 14, 2015) (internal quotation marks and citations omitted). "[T]hreadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice," and "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face." *Id.* (internal quotation marks and citations omitted). Additionally, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Ms. Campbell's first alleged injury is premised on her having paid for an illusory insurance policy that Defendants did not intend to honor. Pl.'s Opp'n at 55; *see also* 1st Am.

---

the Court cannot infer the presence of an argument that has not been specifically raised."); *Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on his behalf in order to counter those in the motion to dismiss.").

Compl. ¶ 82 (alleging that while "the coverage description disclosed some limitations on coverage under the policy, . . . [none of the] Defendant[s] disclosed . . . that there was no intention to pay disability benefits that fell within the terms of coverage."). She argues that "because the HealthExtras Scheme was designed to deny all disability claims, through a list of undisclosed conflicts and exclusions maintained in a Master Policy the insureds are never shown, in reality the payment of premiums purchased only the contractual right to file a legal action against Defendants . . . not disability insurance." Pl.'s Opp'n at 14. A review of Ms. Campbell's complaint, however, reveals that her first assertion of injury is supported by mere conjecture, not by factual allegations that would render her alleged injury plausible.

Significantly, Ms. Campbell never submitted a claim for coverage to Defendants or had a claim denied, and her complaint does not identify a single instance in which any insured had his or her claim denied on the basis of secret exclusions contained only in the Master Policy.[10] Although Ms. Campbell now argues that if she had submitted a disability claim that it would have been denied because Defendants would have applied secret exclusions and restrictions from the Master Policy, according to her complaint, "she has never been provided a copy of [the] Master Policy," she does not know what terms it contains, and her assertion of injury is premised on the possibility that the Master Policy "*may* . . . further trump[] and negate[]" the coverage she purchased *if* it contained undisclosed exclusions or restrictions and *if* Defendants used it to deny otherwise-covered claims. *See* 1st Am. Compl. ¶¶ 71, 75–76 (second emphasis added).

---

[10] Ms. Campbell does later allege that at least two individuals insured in other states submitted disability claims that were denied by Defendants, and she expresses a belief that thousands of others must have had claims denied as well, but she does not allege that any of these denials were a consequence of the enforcement of secret or undisclosed exclusions contained in the Master Policy. 1st Am. Compl. ¶ 111. Accordingly, these factual allegations do nothing to render plausible, rather than merely possible, Ms. Campbell's belief that the Master Policy contains undisclosed exclusions and that Defendants intended to use it to deny all claims.

Such conjecture cannot replace the type of factual allegations necessary to transform a speculative chain of possibilities into a plausible allegation of concrete, actual injury in fact. *Cf. Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013) (finding no actual or imminent injury in fact where plaintiffs' "theory of standing . . . relies on a highly attenuated chain of possibilities," and they "merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired"); *Obama v. Klayman*, No. 14-5004, 2015 WL 5058403, at *9-10 (D.C. Cir. Aug. 28, 2015) (Sentelle, J., dissenting in part on other grounds) (holding that plaintiff's assertion that the government must have been collecting their phone records because the collection was large and plaintiffs used a big carrier was mere "conjecture" that fails to show "actual or imminent" injury in fact necessary to establish standing); *Weaver v. Aetna Life Ins. Co.*, No. 3:08-CV-00037, 2008 WL 4833035, at *3 (D. Nev. Nov. 4, 2008) (dismissing unjust enrichment claim for lack of standing where the plaintiff alleged that she "paid premiums for a nonexistent policy," because "one could not deem a policy nonexistent unless she were improperly denied benefits"), *aff'd*, 370 F. App'x 822 (9th Cir. 2010).[11]

---

[11] As Defendants correctly note, the *Weaver* court is not alone in holding that where a plaintiff has not actually had an insurance claim denied and brings suit to recover premium payments on a theory that the coverage he paid for was illusory or would not have been provided in the manner expected, the speculative claim must be dismissed for lack of injury in fact. *See, e.g.*, *Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1059–61 (C.D. Cal. 2003) (holding that ERISA plaintiffs failed to establish injury in fact to support a breach of contract claim for restitution and disgorgement where their "allegation that Defendants' administration of the plan might result in denial of future benefits is purely speculative and does not suffice to constitute a breach of contract," because until defendants failed to honor a valid claim "there can be no breach of contract"); *Doe v. Blue Cross Blue Shield of Md., Inc.*, 173 F. Supp. 2d 398 (D. Md. 2001) (holding that ERISA plaintiffs' claim that insurer would deny future claims based on a restrictive reading of the parties' contract did not constitute injury to support a breach of contract claim, because contract law "does not recognize a cause of action based on the theory that the market value of the contract itself has been diminished because one side may breach it in the future"). Ms. Campbell did not respond to Defendants' reliance on these

Ms. Campbell protests that this "precise argument has already been rejected in a related case." Pl.'s Opp'n at 56 (citing *Petruzzo v. HealthExtras, Inc.*, No. 5:12-CV-113-FL, 2013 WL 4517273 (E.D.N.C. Aug. 23, 2013)). In the *Petruzzo* opinion on which she relies, the District Court for the Eastern District of North Carolina was presented with nearly identical claims of deceptive trade practices, unjust enrichment, and breach of the duty of good faith and fair dealing brought against many of the same Defendants and premised largely on the same alleged scheme: selling a HealthExtras disability insurance policy that was worthless and void under state law. *See* 2013 WL 4517273, at *1; *see also Petruzzo v. HealthExtras, Inc.*, No. 5:12-CV-113-FL, 2014 WL 2864814, at *2 (E.D.N.C. June 24, 2014) (describing subsequently amended complaint's allegation that the policy was also worthless because it was subject to a master policy the plaintiff never received and contained "contradictions and exclusions which intentionally render the policy virtually worthless to purchasers"). The court considered North Carolina law and determined that because the plaintiff adequately alleged that the insurance policy issued to him never would have been approved by the state, he "sufficiently alleged the cognizable injury of paying for a valueless insurance policy" that was void under state law. *Petruzzo*, 2013 WL 4517273, at *6.

After the opinion was issued, however, the court received another motion to dismiss "raising new argument that plaintiffs lack standing to sue," because a North Carolina statute expressly provided that an insurance policy that violated the applicable state requirements

---

authorities in her opposition brief, and her subsequent argument that the Court should ignore this line of cases as it is improperly raised for the first time in a footnote in Defendants' reply brief, *see* Pl.'s Response at 4–5, is misguided. Ms. Campbell overlooks the fact that Defendants' motion to dismiss cited precisely the same cases for the precisely the same proposition, such that the cases were not raised for the first time in Defendants' reply brief. *See* Catamaran Mem. Supp. Mot. Dismiss at 14–15.

nevertheless "shall be held valid but shall be construed as provided" by statute. *Petruzzo v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 5:12-CV-113-FL, 2015 WL 5042874, at *1 (E.D.N.C. May 22, 2015). The *Petruzzo* court thus determined that "Plaintiffs have suffered neither a concrete nor imminent injury, because the insurance policies supplied through enrollment in the Disability Benefit and Health benefit are valid and enforceable under North Carolina law, despite the alleged deficiencies." *Id.* at *7. The court further explained that "plaintiffs never attempted to collect benefits under either policy," and that under state law, even if they had, their policies were "valid and enforceable by plaintiffs" until their enrollment in the program ended. *Id.* at *8. It therefore dismissed all claims against all defendants for lack of standing. *Id.* at *10.

In this case, the D.C. Code section that Ms. Campbell alleges Defendants violated contains identical language to the North Carolina statute, dictating that non-conforming insurance policies issued in violation of the statute "*shall be held valid* but shall be construed as provided in this section." D.C. Code § 31-4712(d)(2) (emphasis added). Thus, to the extent that Ms. Campbell asserts injury premised on payments for a policy that was invalid and unenforceable due to violations of DC insurance laws, the argument clearly fails as a matter of law.[12] *See also* In Chambers Order Granting Defendants' Motions to Dismiss, *Waiserman v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, No. 2:14-CV-00667, at 3–5 (C.D. Cal. Oct. 24, 2014), ECF No. 84 (rejecting identical claim that plaintiff had standing because he purchased an

---

[12] Ms. Campbell correctly notes that as a general matter, D.C. law provides that a contract made in violation of a licensing statute designed to protect the public will be deemed void and unenforceable. Pl.'s Opp'n at 23. But she cites no authority to suggest that a generally applicable public policy principle can overcome the express language of a statute that states that policies for accident insurance shall be valid regardless of whether they violate any number of provisions pertaining to the requirements for issuing such insurance.

invalid and illusory insurance policy where state law deemed such policies valid and enforceable even if defendants were not licensed sellers and "created a sham trust to mask their dealings").

Ms. Campbell notes that her claim of injury here is somewhat different than in *Petruzzo*, however, in that it is based not on the unenforceability of her policy under D.C. law, but on the fact that she would have been harmed by the enforcement of the policy as written due to the Defendants' application of secret exclusions. Pl.'s Response at 2–3. But as discussed above, the complaint lacks factual allegations that, taken as true, would make such an assertion plausible rather than merely possible. *See Arpaio*, 2015 WL 4772774, at *6 (holding that to survive a motion to dismiss for lack of standing, a "complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face" (internal quotation marks and citation omitted)); *see also* In Chambers Order, *Waiserman*, No. 2:14-CV-00667, at 4 (rejecting as "supposition" and "pure speculation" the allegation that "because the [HealthExtras program] defendants had no intention of paying out claims, they misappropriated [plaintiff's] money," and holding that the alleged harm did not constitute injury in fact).

Accordingly, the Court finds that Ms. Campbell's allegation that the Master Policy may have contained undisclosed exclusions that she believes Defendants would have used to deny any claims, had she made them, does not constitute the type of concrete, particularized, actual injury that supports Article III standing, and the Court lacks jurisdiction to hear such a claim.

This does not end the matter, however, for although Ms. Campbell argued that her first asserted injury "forms the basis of the transaction at issue and many of the claims raised," Pl.'s Response at 3, her allegation regarding paying for an illusory policy is only one of three alleged injuries in this case. She also argues that she has standing to bring all of her claims on the grounds that Defendants charged her premiums in excess of her contractual obligation on at least

two occasions,[13] and she asserts that she has standing to bring her CPPA claim because Defendants violated her statutory right to truthful information about consumer goods and services. Pl.'s Opp'n at 55–57.

Defendants do not appear to challenge the adequacy of either of these alleged injuries for standing purposes, and the Court agrees with Ms. Campbell that unauthorized charges and allegedly material misrepresentations about the program constitute injuries in fact for standing purposes. *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 47 (D.C. Cir. 2014) (holding that plaintiffs may recover mistaken overpayments via an unjust enrichment claim); D.C. Code § 28-3901(c) ("This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." ); *see also Grayson v. AT & T Corp.*, 15 A.3d 219, 249–50 (D.C. 2011) ("[T]he deprivation of a statutory right to be free from improper trade practices may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff would have suffered no judicially cognizable injury in the absence of the statute." (internal quotation marks and citations omitted)). Accordingly, because Ms. Campbell's theories of injury premised on unauthorized premium charges and violations of the CPPA are sufficient to establish standing as to each of her claims, the Court will deny Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(1).

## B. Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants next argue that Ms. Campbell's complaint must be dismissed in its entirety pursuant to Rule 12(b)(6) for failure to state claim. Collectively, Defendants maintain that: (1)

---

[13] This allegation is referenced explicitly in Counts II through V, and is incorporated by reference in Count I, which "realleges and incorporates by reference" all other factual allegations.

Ms. Campbell's claims are time-barred by the applicable statutes of limitations, (2) she has failed

to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure,

and (3) she has failed to allege sufficient factual matter that, taken as true, states a plausible

claim for relief as required by Rule 8.[14]  The Court begins with the question of whether Ms.

Campbell's claims are untimely.

### 1.  Statutes of Limitations

In a motion to dismiss joined by all Defendants, Virginia Surety argues that all of Ms.

Campbell's claims, with the exception of the money had and received claim, are barred by

applicable three-year statutes of limitations.[15]  Virginia Surety Mem. Supp. Mot. Dismiss at 12–

19, ECF No. 38-1.  Defendants argue that because the limitations periods began to run on all of

Ms. Campbell's claims at the time of the injury or breach, her claims accrued in 2000 when she

purchased coverage based on Defendants' alleged misrepresentations, or alternatively, in 2004

when she admits to having received actual notice that the Trust was the policyholder, that a list

of restrictive exclusions limited her coverage in a manner contrary to Defendants'

representations, and that her coverage was subject to the terms of the undisclosed Master Policy.

---

[14] All Defendants have joined in both Virginia Surety's motion to dismiss and in Catamaran's motion to dismiss, which in turn incorporates National Union's argument in favor of dismissal of Count II, the contract claim.

[15] Ms. Campbell concedes that these claims are subject to a three-year limitations period with the exception of her unjust enrichment claim, which she argues is subject to a six-year statute of limitations period.  *See* Pl.'s Opp'n at 65.  Ms. Campbell is incorrect; a claim of unjust enrichment is subject to a three-year limitations period under D.C. law.  *See, e.g., Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 283 (D.C. Cir. 2009) ("Under District of Columbia law, . . . unjust enrichment claims are subject to a three year statute of limitations."); *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1221 (D.C. 2005) (holding that unjust enrichment claim filed over three years after claim accrued was time-barred).

*Id.* at 13–16.  Defendants contend that Ms. Campbell's claims thus expired no later than 2007, and to the extent that her claims are premised on unauthorized premium increases on unspecified dates, her "lack of transparency does not rescue her conversion claim from the statute of limitations."  *Id.* at 16 n.6.

Ms. Campbell disputes Defendants' timeliness arguments, arguing both that the limitations period did not begin to run until shortly before she filed her complaint and that various tolling doctrines apply.  Pl.'s Opp'n at 61–72.  She maintains, for example, that the continuing tort doctrine would toll the limitations period as to all of her claims because Defendants' "long-running campaign of misinformation" and their charging of her credit card "ceased months *after* she filed her initial complaint."  *Id.* at 63–66.  Ms. Campbell next asserts that her claims of conversion and breach of contract and the duty of good faith and fair dealing are also timely brought under the discovery rule, because the 2004 description of coverage that she received did not put her on notice "of the involvement of all of the defendants in the Scheme or the distribution of portions of her premium payments to Defendants other than HealthExtras."  *Id.* at 63–70.  As to her CPPA claim, Ms. Campbell contends that because she continuously renewed her policy through 2014 "pursuant to Defendants' misrepresentations, omissions, and false impressions," because the Defendants continuously charged her the wrong amount, because she still has not received a copy of the Master Policy, and because she was not aware until filing her complaint that Defendants violated certain insurance-related regulations and that the Trust was not a valid group, the limitations period for the claim did not begin to run until shortly before she initiated this suit.  *Id.* at 70–72.

It is well-established that "[b]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is

conclusively time-barred." *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("[C]ourts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.").  From the face of Ms. Campbell's complaint, however, the Court is unable to determine whether her claims are, in fact, time-barred.

As to Ms. Campbell's claim that she was charged greater-than-authorized premiums, she does not specify when between 2000 and 2014 those charges occurred, leaving open the possibility that such acts occurred within three years of the filing of her complaint.  Drawing all inferences in Ms. Campbell's favor, it is also possible that Defendants continued, unbeknownst to Ms. Campbell, to misrepresent the validity of the group and the percent of premiums that would go towards insurance, to obscure the interrelationships between Defendants, to falsely imply that they were licensed insurance companies, to misrepresent the identity of the insurer and underwriters, and to violate DC insurance regulations through 2014.  Defendants may ultimately prove correct in their assertion that the allegedly unauthorized premium increases occurred more than three years before the filing of Ms. Campbell's complaint, or that she was on notice of the facts giving rise to her claims more than three years before filing this suit.  But because the Court cannot determine such matters conclusively from the face of the complaint, the motion to dismiss all claims as untimely must be denied.

The Court therefore finds that dismissal of Ms. Campbell's claims on statute of limitations grounds at this time would be improper.  *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013) (holding that if a plaintiff's potential "rejoinder to the affirmative defense is not foreclosed by the allegations in the complaint, dismissal at the Rule 12(b)(6) stage is improper" (internal quotation marks and citations omitted)); *see also Floyd v. Lee*, 968 F.

Supp. 2d 308, 326 (D.D.C. 2013) (holding that where it was "not clear from the face of the complaint" when the event triggering the limitations occurred, "the court need not decide what would follow from the conclusion" that the limitations period began on a particular date).

Accordingly, the Court proceeds to consider Defendants' final argument in favor of dismissal: that each of Ms. Campbell's claims must be dismissed pursuant to Rule 12(b)(6) for either failure to state a plausible claim for relief under Rule 8 or for failure to plead fraud with particularity under Rule 9.

## 2. Unjust Enrichment (Count I)

Ms. Campbell's complaint asserts three common law claims, the first of which is for unjust enrichment, as an alternative to her breach of contract claim.[16]  Specifically, Ms. Campbell asserts that Defendants have received and retained the benefit of her premium payments unjustly because they sold her insurance that was illegal, void, and worthless under D.C. law, *see* 1st Am. Compl. ¶¶ 166–84, and that on two occasions, Defendants charged her

---

[16] Defendants dispute whether Ms. Campbell has adequately alleged the existence of a contractual agreement that prevented Defendants from increasing her premiums. Catamaran Mem. Supp. Mot. Dismiss at 21–22.  Accordingly, although Ms. Campbell cannot claim unjust enrichment based on payments made pursuant to a contractual obligation, to the extent that she claims that Defendants obtained payments not authorized by any contract, an alternative claim of unjust enrichment claim is permissible.  *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (holding that existence of a contract did not bar plaintiff's unjust enrichment claim where contract did not authorize the charge in question, which "was instead an extra-contractual payment falling outside the 'scope' of the governing contracts," such that the contract "pose[d] no obstacle to an unjust enrichment claim seeking to recover . . . fees paid"); *see also Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63–65 (D.C. 2005) ("One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement.  The equities may be quite different, however, where A, who claims that B has been unjustly enriched at A's expense, has a contract with C rather than with B."); *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 9 n.10 (D.D.C. 2009) ("While defendants are correct that plaintiff ultimately cannot recover under both a breach of contract claim and an unjust enrichment claim pertaining to the subject matter of that contract, at this juncture, plaintiff's unjust enrichment claim is an alternate theory of liability which it may pursue.").

increased premium payments in excess of her contractual obligation and without authorization from her or from DISB.[17]

In their motions to dismiss, Defendants first argue that Ms. Campbell's unjust enrichment claim fails as a matter of law because D.C. Code § 31-4712 explicitly states that even if Defendants failed to comply with § 31-4712's requirements when issuing Ms. Campbell's policy, the policy would nevertheless be valid, enforceable, and construed to comply with the law. Catamaran's Mem. Supp. Mot. Dismiss at 11–14. They also contend that § 31-4712 expressly exempted group policies from its requirements until April 8, 2011, such that there was no violation when Ms. Campbell's policy was issued. *Id.* at 10–11. Thus, Defendants conclude that Ms. Campbell's allegation that her policy was illegal, void, and worthless fails as a matter of law. Additionally, as to the allegation of unauthorized charges, Alliant Services argues that the claim fails because Ms. Campbell does not allege that it "received any premium payments directly from Plaintiff." Alliant Mem. Supp. Mot. Dismiss at 8–9, ECF No. 35-1.

Under D.C. law, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008) (quoting *News World Commc'ns, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C. 2005)). "In such a case, the recipient of the benefit has a duty to make restitution to the other person . . . ." *4934, Inc. v. D.C. Dep't of Emp't Servs.*, 605 A.2d 50, 55 (D.C. 1992) (citing Restatement (First) of Restitution § 1 cmt. c (1937)). A claim

---

[17] Although Ms. Campbell's unjust enrichment claim as set forth in her complaint does not explicitly cite the allegation that Defendants charged her more than her contractual obligation, it does "reallege[] and incorporate[] by reference" that factual allegation, *id.* ¶ 166, and Ms. Campbell's opposition brief argues that the allegation is included in her unjust enrichment claim, Pl.'s Opp'n at 25.

that unjust enrichment occurred is context-specific, and will require consideration of "the particular circumstances giving rise to the claim" that the retention of a given benefit is unjust. *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813–14 (D.C. 2009).

The first circumstance that Ms. Campbell argues makes Defendants' retention of her premium payments unjust is the fact that the policy she paid for was illegal, void, and worthless under D.C. law. *See* 1st Am. Compl. ¶¶ 169–82 (alleging that Defendants marketed insurance that was illegal under D.C. Code § 31-4712, and that she conferred a benefit on Defendants "without knowledge that the purchased coverage was illegal and void"). In effect, she argues that she paid for valid and enforceable insurance coverage that she did not receive. But as Defendants aptly point out, even assuming that Ms. Campbell is correct in alleging that Defendants' issuance or renewal of her policy violated the requirements of § 31-4712, her conclusion that this rendered her policy void and worthless such that her contracted-for payments should be returned to her is foreclosed by the plain language of § 31-4712(d)(2),[18] which states that policies issued in violation of the provision are valid and enforceable. Accordingly, the Court finds that, to the extent that Ms. Campbell claims that Defendants unjustly retained her premium payments because the policy they sold her was void, illegal, or unenforceable, she has failed to state a plausible claim for relief.[19]

---

[18] "A policy delivered or issued for delivery to any person in the District in violation of this section shall be held valid but shall be construed as provided in this section. When any provision in a policy subject to this section is in conflict with any provision of this section, the rights, duties, and obligations of the insurer, the insured, and the beneficiary shall be governed by the provisions of this section." D.C. Code § 31-4712(d)(2).

[19] Having found that this aspect of Ms. Campbell's unjust enrichment claim fails even under the more lenient plausibility standard of Rule 8(a), the Court need not consider Defendants' alternative argument that it should be dismissed for failure to comply with the particularized pleading standard of Rule 9(b).

Ms. Campbell also argues, however, that Defendants were unjustly enriched on two occasions when they received and retained higher-than-authorized premium payments.  Pl.'s Opp'n at 25.  She alleges—albeit vaguely—that on two occasions, Defendants charged her credit card for premium payments in excess of the authorized amount.  Alliant Services argues that Ms. Campbell's failure to allege that she made a direct payment to Alliant Services constitutes a failure to state a claim, but neither of the cases it cites in support of this assertion holds that a benefit unjustly retained must have been directly conferred to state a claim of unjust enrichment. *See Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 29 (D.D.C. 2014) (holding that where complaint did not clearly allege the benefit wrongfully retained, and where allegations of retention lacked factual support and were premised on the existence of a contractual agreement that foreclosed an unjust enrichment claim, the claim must be dismissed); *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 186 (D.D.C. 2006) (holding that unjust enrichment claim premised on the paid-for purchase of a patent portfolio failed where all parties consented to the purchase, substantial consideration was paid, and no direct benefit was conferred to the purchaser).

To the contrary, a number of decisions from this Court have expressly held that a benefit indirectly conferred on a defendant can support an unjust enrichment claim.  *See, e.g., JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 523 n.5 (D.D.C. 2014) (holding that the theory of unjust enrichment can apply to payments conveyed to a defendant through a third-party intermediary); *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 142 (D.D.C. 2010) (holding that where party was an "indirect recipient" of payments and retained those payments in circumstances alleged to be unjust, plaintiff had adequately alleged a claim of unjust enricment); *Ca de Lupis v. Bonino*, No. 07-01372, 2010 WL 1328813, at *12 (D.D.C. Mar. 31, 2010) ("The defendant mistakenly asserts that because the actual agreement . . .

was with a third party and conferred no benefit to him, he cannot be held liable."). Ms. Campbell alleges generally that "each Defendant received money and profited from the illegal" program, 1st Am. Compl. ¶ 117, and she specifically asserts that Catamaran and HealthExtras LLC collected her premium payments, *see id.* ¶ 123, underwriters National Union and Virginia Surety and broker Alliant Services all received payments to lend their names to the scheme, *id.* ¶¶ 131, 150, 157, and AIG, which developed and controlled the trust, "received a portion of the illegal insurance premiums paid by Plaintiff," *id.* ¶ 147. Taking these factual allegations as true and drawing all reasonable inferences in Ms. Campbell's favor, the Court finds that she has adequately alleged that she conferred a benefit on Defendants when they collected and shared her premium payments.

This leaves the Court with the question of whether Ms. Campbell has plausibly alleged that Defendants' retention of this benefit was unjust under the circumstances. According to Ms. Campbell's complaint, although she "agreed to pay premiums," on at least two occasions, her "credit card and bank accounts were debited for an increased premium amount [she] did not authorize and was not authorized under District of Columbia law and therefore [she] had [her] personal property or money unlawfully taken." 1st Am. Compl. ¶¶ 27, 60. To the extent that Ms. Campbell alleges that Defendants charged her more than they were authorized by her or by D.C. law, she has plausibly stated that Defendants' retention of the unauthorized portion of her premium payments was unjust. *See In re APA Assessment Fee Litig.*, 766 F.3d at 48 (explaining that where a party agrees to be billed one amount but is then intentionally overcharged, the party can bring an unjust enrichment claim to recover the amount of his overpayment). Accordingly,

the Court will not dismiss Ms. Campbell's unjust enrichment claim for failure to state a claim under Rule 12(b)(6).[20]

### 3. Conversion (Count III)

Ms. Campbell's second common law claim alleges that Defendants have appropriated her money for their own use and have exercised dominion and control over the premium amounts charged to her that exceeded her contractual obligation and fell outside the terms of her agreement to pay premiums.  1st Am. Compl. ¶¶ 196–200.  Defendants argue that this conversion claim must be dismissed because it is impermissibly based on an alleged breach of contract, Ms. Campbell fails to plausibly allege that all Defendants agreed to freeze her premium rates indefinitely, and she does not allege that Defendants exercised control over a specified, identifiable fund of money that belongs to her.  Catamaran Mem. Supp. Mot. Dismiss at 21–22.[21] Additionally, Alliant Services argues that Ms. Campbell has not plausibly alleged that it, as opposed to the other Defendants, actually debited her credit card for unauthorized increases,

---

[20] Defendants argue for the first time in a reply brief that Ms. Campbell's unjust enrichment claim fails because she "has failed to plead the absence of a legal remedy." Catamaran Reply at 26.  This argument is both untimely and flatly contradicted by Ms. Campbell's complaint, which twice alleges that but for the unjust enrichment claim, she has "no other remedy at law" available to her to recover damages.  1st Am. Compl. ¶¶ 173, 183.  The Court will thus not dismiss the unjust enrichment claim on this basis.  *See Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 102 (D.D.C. 2006) (rejecting motion to dismiss unjust enrichment claim due to availability of other remedies because "[w]hile it is true that the plaintiffs would not ultimately be able to recover damages based on mutually exclusive or otherwise contradictory theories of liability, it is inappropriate, in light of the express language of Rule 8(e)(2), to dismiss such theories at this early stage in the litigation merely because the plaintiff has requested both legal and equitable remedies").

[21] Defendants do not argue that Ms. Campbell's conversion claim must be pled with particularity under Rule 9(b).  Accordingly, the Court evaluates Ms. Campbell's claim of conversion for compliance with Rule 8(a).  *See Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 145 (D.D.C. 2013) (holding that plaintiff adequately alleged a claim of conversion despite failure to include "any details regarding the timing or amounts of the alleged payments made, or how, exactly, they were erroneously misapplied," because "unlike fraud, a common law conversion claim mandates no special pleading standard").

Alliant Mem. Supp. Mot. Dismiss at 11, and National Union and AIG argue that she has failed to allege that National Union "ever increased the premium it charged for the coverage it provided," National Union Mem. Supp. Mot. Dismiss at 2–3, ECF No. 37-1.

To state a claim for conversion under D.C. law, a plaintiff must allege "'(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto.'" *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (quoting *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 62 (D.D.C. 2002)); *see also Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011). "Generally speaking, conversion applies to chattel; however, '[m]oney can be the subject of a conversion claim if the plaintiff has the right to a specific identifiable fund of money." *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013) (quoting *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 176 (D.D.C. 2013)); *see also Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 833 n.3 (Md. 2004) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds."). "A cause of action for conversion, however, may not be maintained to enforce a mere obligation to pay money." *Curaflex Health Servs., Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995).

The Court's inquiry as to whether Ms. Campbell has plausibly alleged a claim of conversion begins and ends with the question of whether Ms. Campbell has alleged facts showing that Defendants exercised control over a specific and identifiable fund of money that constitutes her personal property. In support of their position that Ms. Campbell has not so alleged, Defendants rely primarily on *Cannon v. Wells Fargo Bank, N.A.*, which rejected a claim of conversion premised on allegations that the defendants had charged the plaintiff a premium

payment to which they were not entitled because the plaintiff did not "articulate a right to any specific identifiable fund of money." 926 F. Supp. 2d 152, 176 (D.D.C. 2013). Defendants also analogize Ms. Campbell's case to that of *Ficken v. AMR Corp.*, where this Court rejected a claim of conversion premised on the alleged taking of frequent flyer miles, reasoning that the miles "amounted to credit with the airline," and as such, could not be the subject of a conversion claim. 578 F. Supp. 2d 134, 143 (D.D.C. 2008) (reasoning that because conversion extends "only to intangible rights identified by a tangible document that is converted . . . a plaintiff may bring a suit for conversion of a promissory note . . . but not for conversion of a debt" (internal quotation marks omitted)). Finally, Defendants argue that overcharges or unauthorized charges to a credit card cannot support a conversion claim because such allegations do not call for the return of specific money. *See, e.g.*, *Scott v. Rosenthal*, No. 97civ2143, 2000 WL 1863542, at *10 (S.D.N.Y. Dec. 20, 2000) (holding that allegation that defendant made unauthorized purchases on plaintiffs' credit card showed that through the defendant's "wrongful action [plaintiffs] have incurred a debt to third parties," and that "[w]hile they might recover for such a claim on the ground of unjust enrichment . . . , they may not in conversion"); *Macula v. Lawyers Title Ins. Corp.*, No. 1:07 CV 1545, 2008 WL 3874686, at *5 (N.D. Ohio Aug. 14, 2008) (holding that where "Plaintiffs merely claim that they are entitled to a refund or credit for an overcharge," they have failed to state a claim for conversion).

Ms. Campbell concedes that District of Columbia courts require a plaintiff alleging conversion of money to establish a "right to a specific identifiable fund of money,"[22] but she

---

[22] For this proposition, Ms. Campbell cites *Government of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 62–63 (D.D.C. 2002), which held that the defendants were liable for conversion of two checks totaling $83,000, which the defendants had unlawfully retained despite breaching their contractual obligations to the plaintiffs.

notes that the phrase "remains undefined in the District of Columbia," and that other courts accept allegations that converted sums were 'identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit.'" Pl.'s Opp'n at 34 (quoting *Scholes Elec. & Commc'ns, Inc. v. Fraser*, No. 04-civ-3898, 2006 WL 1644920, at *5 (D.N.J. June 14, 2006) (unpublished)). Thus, she concludes that the money she paid for insurance was "specifically and identifiably her property," as it was "deducted from her credit card on a monthly or yearly basis, without Plaintiff's consent and without the requisite regulatory approval," and that "[i]n such a situation, a conversion claim against the insurer should be permissible." Pl.'s Opp'n at 34.

Ms. Campbell's brief offers no discussion or refutation of the authorities upon which Defendants rely. *See id.* at 33–34. She does not explain how her claim of unauthorized premium payments is distinguishable from the allegation found inadequate to support a claim of conversion in *Cannon*, nor does she offer any developed argument to undermine Defendants' assertion that a credit card charge cannot serve as the basis for a conversion claim. In *Scholes*, the unpublished opinion on which Ms. Campbell's argument relies, the District Court of New Jersey held that where a plaintiff alleged that defendants wrongfully retained funds owed to him for work that he had performed, he failed to state a claim for conversion under New Jersey law because "the funds at issue were not sufficiently segregated or identifiable to be considered Plaintiff's property." 2006 WL 1644920, at *6 (explaining that the relevant contracts did not require that funds owed to the plaintiff be segregated upon receipt). The case thus offers no support for Ms. Campbell's position that Defendants' allegedly unauthorized charges to Ms. Campbell's credit card can support a claim for conversion.

In light of Ms. Campbell's failure to even attempt to distinguish her case from the precedents relied upon by Defendants, or to cite any authority indicating that an excessive credit card charge can provide a basis for a claim of conversion, the Court will dismiss Ms. Campbell's conversion claim pursuant to Rule 12(b)(6) for failure to state a claim.[23]  *See Fraternal Order of Police/Dep't of Corr. Labor Comm. v. Williams*, 263 F. Supp. 2d 45, 48 (D.D.C. 2003) (dismissing claim where "Plaintiffs have failed to distinguish these precedents or to point to any basis for this Court to come to any different conclusion"); *see also Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on his behalf in order to counter those in the motion to dismiss.").

### 4.  Money Had and Received (Count V)

Ms. Campbell's third and final equitable claim is for money had and received.  Like her unjust enrichment and conversion claims, this claim is also predicated on the allegation that

---

[23] The Court notes that where an issue pertaining to D.C. common law has not been resolved by the D.C. Court of Appeals, courts give special attention to any pertinent authority from the Court of Appeals of Maryland.  *McClintic v. McClintic*, 39 A.3d 1274, 1281 n.2 (D.C. 2012) ("Since the District of Columbia derives its common law from Maryland, decisions of the Court of Appeals of Maryland on questions that have not been determined by the Court of Appeals for this Circuit are of great weight." (internal quotation marks omitted)).  At least two such opinions suggest that the phrase "specific identifiable fund of money" means "identical" bills, and that it does not encompass a claim like Ms. Campbell's, which is premised on an alleged overpayment.  *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 834 n.3 (Md. 2004) (questioning whether a "$2500 cash payment" could be recovered on a claim for conversion where the defendant allegedly retained the payment unlawfully but "did not have an obligation to return the specific bills used for the down-payment"); *Lawson v. Commonwealth Land Title Ins. Co.*, 518 A.2d 174, 177 (Md. 1986) (holding that no claim for conversion was available where defendant unlawfully retained an overpayment he received via check and thus owed plaintiff a debt, but had "no obligation to return the identical money").  However, because the Court finds that Ms. Campbell has failed to offer any developed argument or citation to relevant authorities that contradict Defendants' position that a premium payment overcharged to a plaintiff's credit card does not implicate a specific, identifiable fund of money recoverable in an action for conversion, the Court need not determine whether the opinions from Maryland are controlling.

Defendants charged her unauthorized premium payments over and above her contractual obligation.  *See* 1st Am. Compl. ¶¶ 229–33; Pl.'s Opp'n at 30.  Defendants argue that the claim must be dismissed because it depends on an agreement not to increase her premium costs, and such an agreement has not been adequately alleged.  Catamaran Mem. Supp. Mot. Dismiss at 23.  They also argue that because Ms. Campbell could have told her credit card issuer not to make the allegedly unauthorized payments, she has not shown that she should recover the overpayments "in equity and good conscience."  *Id.*  Alliant Services further asserts that Ms. Campbell's money had and received claim is "duplicative of her unjust enrichment claim, and must fail for the same reasons," and that she cannot recover premium payments "in equity and good conscience" when she received the enforceable coverage she bargained for.  Alliant Mem. Supp. Mot. Dismiss at 12–13.

In the District of Columbia, "[w]here one person receives money that in equity and good conscience belongs to another, an action will lie for money had and received."  *Credit Lyonnais-N.Y. v. Wash. Strategic Consulting Grp., Inc.*, 886 F. Supp. 92, 93 (D.D.C. 1995) (internal quotation marks omitted) (citing *Hillyard v. Smither & Mayton, Inc.*, 76 A.2d 166, 167 (D.C.1950)).  Like a claim for unjust enrichment, a claim for money had and received is a quasi-contract claim, and "is founded on the principle that no one ought unjustly to enrich himself at the expense of another."  *Hillyard*, 76 A.2d at 167; *see also Credit Lyonnais-N.Y.*, 886 F. Supp. at 93 (explaining that "[t]he equitable doctrine of unjust enrichment is very similar" to a claim of money had and received); *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 102 (D.D.C. 2006) (analyzing claim of money had and received as a claim for unjust enrichment).

Defendants' first argument in favor of dismissal posits that because Ms. Campbell's claim is premised on an allegation that Defendants charged her premium payments in excess of

her contractual obligation, and because she has not identified the material terms of the contract in question, she has failed to plead facts supporting an inference that the unauthorized payments should be returned to her "in equity and good conscience." Catamaran Mem. Supp. Mot. Dismiss at 23. The Court disagrees. Defendants do not assert that Ms. Campbell's money had and received claim is subject to Rule 9(b)'s particularized pleading requirement,[24] and while her claim would no doubt be strengthened had she included the specific dates and amounts at issue, her complaint clearly alleges that on two occasions, Defendants increased her premium payments and charged her credit card for a greater amount than she had authorized. 1st Am. Compl. ¶ 229. She identified the Defendants who collected her premium payments directly, and those Defendants who allegedly received a portion of the payments indirectly. *See id.* ¶¶ 123, 131, 147, 150, 157. Taking Ms. Campbell's factual allegations as true, and drawing all reasonable inferences in her favor, the Court finds that she has stated a plausible claim for money had and received by alleging that Defendants charged her in excess of the amount authorized for her premium payments, and that the excess payments received by Defendants "in equity and good conscience" should be returned to her because they were not authorized. Although Defendants argue that Ms. Campbell could have told her credit card issuer not to allow the payments in question, it is unclear from the face of the complaint when Ms. Campbell knew or reasonably should have known of the excess charges, and in any case, it would be inappropriate for the Court to assess the equitable merit of Ms. Campbell's claim at this stage of the litigation; it is enough for the time being that she has alleged facts that, if true, state a plausible claim for relief.

---

[24] The Court notes as well that Defendants have not moved for a more definite statement of Ms. Campbell's claims.

The Court also rejects Alliant Services' argument that because Ms. Campbell received an enforceable insurance policy, Defendants' retention of the premium payments in question could not be unjust.  As Ms. Campbell notes, the basis of her claim is that she was charged for premium payments that were not authorized by her or DISB.  Pl.'s Opp'n at 30.  Accordingly, the fact that Ms. Campbell received the benefit of her bargain as to those payments that were contractually authorized does not prevent her from seeking to recover contractually-unauthorized payments in equity.  *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (holding that existence of a contract did not bar plaintiff's unjust enrichment claim where contract did not permit the charge in question, which "was instead an extra-contractual payment falling outside the 'scope' of the governing contracts," such that the contract "pose[d] no obstacle to an unjust enrichment claim seeking to recover . . . fees paid").

Alliant Services' final argument—that Ms. Campbell's money had and received claim duplicates her unjust enrichment claim and thus should be dismissed for the same reasons—falls flat in light of the Court's denial of Defendants' motion to dismiss the unjust enrichment claim. To the extent that Alliant Services may have intended to argue that the duplicative nature of the claims is itself a basis for dismissing the money had and received count, however, the Court notes that such an argument is not without appeal.  "A court may dismiss duplicative claims in its discretion . . . when they stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available."  *WMI Liquidating Trust v. Fed. Deposit Ins. Corp.*, No. 14-cv-1816, 2015 WL 3745210, at *10 (D.D.C. June 9, 2015) (internal quotation marks and citations omitted).  Here, however, Defendants have failed to argue that the applicable legal standards and available relief are identical, and Ms. Campbell has directed the Court's

attention to at least one case suggesting that unjust enrichment and money had and received claims are distinct, albeit "very similar." *See Credit Lyonnais-N.Y.*, 886 F. Supp. at 93.

In the absence of any developed argument from Defendants, the Court will not dismiss the money had and received claim as duplicative at this time. *See Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 241 n.1 (D.D.C. 2011) ("Such duplicative claims need not be dismissed at this early stage in the litigation," so long as they are "dismissed before the case is submitted to a jury" (internal quotation marks omitted)).

### 5. Breach of Contract and the Duty of Good Faith and Fair Dealing (Count II)

Ms. Campbell's next claim asserts a breach of contract and the implied duty of good faith and fair dealing, and it is pled in the alternative to her three equitable claims. The claim is comprised of two parts: (1) Defendants breached the terms of their contract with Ms. Campbell by unilaterally charging her more than her contractual obligation, and (2) Defendants breached the duty of good faith and fair dealing because they knew that they were selling her a worthless and illegal "group" policy but failed to inform her of that fact. 1st Am. Compl. ¶¶ 185–94. As to the breach of contract claim, Defendants argue Ms. Campbell has failed to allege that any Defendant agreed to freeze her premium rates indefinitely, and she failed to identify the parties to or material terms of any such agreement. Catamaran Mem. Supp. Mot. Dismiss at 21–23. Alliant Services adds that Ms. Campbell "does not plausibly allege that she had any contract, void or otherwise, with Alliant Services." Alliant Mem. Sup. Mot. Dismiss at 10. Ms. Campbell, in turn, protests that she has adequately alleged that each Defendant breached the terms of their contract. *See* 1st Am. Compl. ¶ 187 ("Defendants, individually and collectively, contracted with the Plaintiff . . . to pay a premium for insurance coverage.").

As the D.C. Court of Appeals recently explained, "to state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis v. Rehman*, 110 A.3d 615, 620–21 (D.C. 2015). [25]  Here, Ms. Campbell alleges that in 2000, Catamaran "specifically offered Plaintiff the opportunity to purchase disability insurance," and she "agreed to pay premiums which subsequently appeared as charges/debits on her credit card statements." 1st Am. Compl. ¶¶ 56–60.  She further alleges that Catamaran accepted her enrollment, "determined the amount of premiums charged," and charged her premiums "on a periodic basis," *id.* ¶¶ 61–63, 130, until August 1, 2012, at which point Catamaran transferred her policy to HealthExtras LLC, who then began to "service[], administer[], collect[] and allocate[] premiums for the insurance Scheme," *id.* ¶¶ 7, 11, 110.  She further alleges that on two occasions, her credit card was "debited for an increased premium amount," that the amount was "for more than the contractual obligation," and that she did not authorize it. *Id.* ¶¶ 65, 164, 188.

Ms. Campbell asserts that these allegations are sufficient to state a plausible claim that she contracted with all Defendants, and that all Defendants violated their contracts with her by collecting higher-than-authorized premiums. *Id.* ¶ 187; Pl.'s Opp'n at 27.  The Court disagrees. As an initial matter, Ms. Campbell has alleged only that Catamaran and HealthExtras LLC collected her insurance payments, and she asserts that Catamaran alone determined how much she would be charged for her premiums. *Id.* ¶ 130.  Thus, to the extent that a contract term was breached by the charging and collecting of excessive premiums, Ms. Campbell has failed to

---

[25] Defendants do not suggest that Ms. Campbell's allegation that Defendants breached their contracts by charging unauthorized rates constitutes an averment of fraud subject to Rule 9(b), and the Court thus proceeds to consider the claim under Rule 8(a).

allege facts plausibly suggesting that any Defendant other than Catamaran or perhaps HealthExtras LLC could have taken such an action.

Moreover, at no point in her complaint does Ms. Campbell describe the terms of her alleged contract, other than to say that she agreed to pay premiums.[26]  *See* 1st Am. ¶ 60, 187.  If any term of her contract prohibited increases in premium rates, she has failed to identify or describe that term.  *Cf. Francis*, 110 A.3d at 620–21 (holding that at a minimum, a plaintiff must "describe the terms of the alleged contract and the nature of the defendant's breach"); *Logan v. LaSalle Bank Nat. Ass'n*, 80 A.3d 1014, 1023–24 (D.C. 2013) (holding that plaintiff's failure to identify "a governing contractual provision" made "dismissal under Rule 12(b)(6) proper"); *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 176 (D.D.C. 2013) (dismissing breach of contract claim where plaintiff "failed to identify any duty or obligation" in the contract that would bar the defendant from acting in the manner that plaintiff alleged constituted a breach); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 9 (D.D.C. 2013) (holding that plaintiff's "claim of breach of an express contractual duty fails because [he] has identified no provision of either purported contract that created any contractual duty that [defendants] are alleged to have violated").  In the absence of such factual allegations, the Court finds that Ms. Campbell has failed to state a plausible breach of contract claim, and the claim will therefore be dismissed pursuant to Rule 12(b)(6).

---

[26] Ms. Campbell argues that she should not be required to provide "more specific information regarding precise contractual clauses and terms" because Defendants have not provided her with a copy of the Master Policy.  Pl.'s Opp'n at 27.  But Ms. Campbell does not appear to allege that the contract term in question is contained in the Master Policy, and the fact that she has not received all potentially relevant documents does not relieve her of the duty to describe the terms of the contract provision that she claims Defendants breached.

Ms. Campbell also alleges that Defendants violated the implied duty of good faith by selling her worthless insurance that they knew was illegal under D.C. law.  Defendants argue that the allegation that Defendants sold her insurance that they knew was illegal "sounds in fraud" and fails to satisfy Rule 9(b)'s particularized pleading requirement.  Catamaran Mem. Supp. Mot. Dismiss at 15–21.  Defendants further dispute that Ms. Campbell's policy was illegal, void, and worthless, *id.* at 10–15, and they argue that because her policy was enforceable, they cannot have breached the implied duty of good faith by selling her unenforceable coverage, *id.* at 23–24 ("The breach of the duty of good faith and fair dealing must necessarily arise out of the performance or enforcement of the contract." (quoting *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 275 (D.D.C.2009)).  Ms. Campbell responds by asserting that because her contract claim does not require a showing of fraud to prevail she is not subject to Rule 9(b), that she could satisfy Rule 9(b) in any event, and that she has adequately alleged a breach of the implied duty of good faith.  Pl.'s Opp'n at 16–17, 26–29.  Because the Court ultimately finds that Ms. Campbell fails to state a claim of breach of the implied duty of good faith even if not subject to Rule 9(b), the Court need not determine whether Rule 9(b)'s particularity requirement applies.

Under D.C. law, "all contracts contain an implied duty of good faith and fair dealing . . . [which] means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 321 (D.C. 2008) (internal quotation marks and citation omitted). "A party breaches this covenant if it 'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party' to the contract." *Brown v. Sessoms*, 774 F.3d 1016, 1025 (D.C. Cir. 2014) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)).  Significantly, a claim for "breach of the duty of good faith and fair dealing

must necessarily arise out of the performance or enforcement of the contract, not out of the contract negotiations." *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 275 (D.D.C. 2009) (citing *Ellipso, Inc. v. Mann*, 541 F .Supp. 2d 365, 373–74 (D.D.C. 2008)).

To the extent that Ms. Campbell's breach of the duty of good faith and fair dealing claim arises out of any misrepresentations, omissions, or illegality in Defendants' statements or advertisements that led her to purchase the policy in question, the claim clearly fails.  As Defendants correctly point out, such a claim can only arise out of the performance or enforcement of the parties' contract. *See C & E Servs.*, 601 F. Supp. 2d at 275.  Thus, the allegation that Defendants failed to tell Ms. Campbell that her policy was illegal before selling it to her does not support a claim for breach of the implied duty of good faith and fair dealing, which arises only after a contract has been formed. *See Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 244 (D.D.C. 2011) (holding that where plaintiff alleged that defendants affirmatively misrepresented and withheld "the true nature" of the subject of a contract "prior to the formation of the sale contract," plaintiff alleged "if anything, bad faith in negotiation, which is not a violation of the implied contractual duty of good faith and fair dealing"); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 9 (D.D.C. 2013) (holding that plaintiff could not state a claim of breach of the implied duty of good faith based on allegation that defendants fraudulently induced him to enter into an agreement because an "allegation regarding 'pre-contract negotiations' cannot state an implied duty claim under D.C. Law").

Ms. Campbell does also allege that post-contract actions are at issue, however, in that Defendants continued to collect premium payments for a policy that they knew was illegal and unenforceable.  Pl.'s Opp'n at 28–30.  These allegations, she argues, are sufficient to show that Defendants' actions "had the effect of destroying or injuring the right of the plaintiff to receive

the fruits of the contract." *Id.* at 28 (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)).  She does not elaborate on this assertion, however, failing to explain how a claim that Defendants received her premium payments without notifying her of the allegedly illegal nature of her policy interfered with her right to receive the insurance coverage she had bargained for.  In *Hais*—the only authority Ms. Campbell invokes to support her assertion that she adequately alleged interference with her right to receive the benefit of her contract—the D.C. Court of Appeals held that the duty of good faith and fair dealing does not "require[] a creditor to ensure fair dealings between co-debtors."  547 A.2d 986 at 988.  The case thus sheds no light on how Defendants' alleged acts destroyed or injured Ms. Campbell's right to receive the fruits of her contract, *i.e.*, HealthExtras disability insurance coverage.

As Defendants argue and as the Court has previously explained, D.C. Code § 31-4712(d)(2) provides that accident insurance policies issued to D.C. residents that violate the provisions of that section—as Ms. Campbell alleges her policy did—will nevertheless be held valid and enforceable by the insured, with any conflicting provisions construed in accordance with the statute.  Thus, even assuming that Ms. Campbell's policy was issued in violation of one or more provisions of § 31-4172, that Defendants were aware of that fact and continued to collect Ms. Campbell's premium payments without informing her, it is not clear how these facts could possibly, let alone plausibly, indicate that Defendants' actions "had the effect of destroying or injuring the right of the plaintiff to receive the fruits of the contract."

Taking Ms. Campbell's factual allegations as true, she contracted to receive a specified disability insurance policy with the expectation that the policy be valid and enforceable under D.C. law.  She has produced neither allegations nor arguments indicating that Defendants' failure to inform her of the policy's non-compliance with certain aspects of D.C. insurance laws and

regulations in any way destroyed, injured, or otherwise interfered with right to receive the insurance that she purchased.  *Cf. Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015) (holding that where defendants knew of but failed to disclose the existence of impending construction in the area, they did not violate the duty of good faith or deprive plaintiffs "of the fruits of the sales contract—namely, a residence whose value would not be diminished by impending construction . . . because they received good title to the property at issue under the terms and conditions set forth in the contract").  The Court thus finds that Ms. Campbell has failed to state a claim for breach of the implied duty of good faith and fair dealing and will dismiss the claim pursuant to Rule 12(b)(6).

### 6.  CCPA claims (Count IV)

Ms. Campbell's final claim for relief alleges that Defendants violated twelve distinct provisions of the CPPA by misrepresenting facts about the HealthExtras program, concealing the terms of the Master Policy, obscuring the interrelationships between Defendants, implying that various Defendants were licensed insurance companies, advertising coverage Defendants never intended to provide, charging her premiums in excess of her contractual obligation for illusory insurance, misrepresenting the identity of the insurer and underwriter, and violating § 31-4712 and advertising-related insurance regulations.  *See* 1st Am. Compl. ¶¶ 201–27.

Defendants argue first that Ms. Campbell's CPPA claim fails to comply with the particularized pleading requirement of Rule 9(b), which they argue applies because Ms. Campbell alleges that Defendants made a number of misrepresentations about the disability insurance program.  Catamaran Mem. Op. at 15–17.  Defendants also assert that her specific allegation regarding Defendants' intent to deny all claims is a bald accusation that fails to satisfy Rule 8, and that her entire CPPA claim fails as a matter of law because her policy was valid and

enforceable. *Id.* at 10–14, 20.  Alliant Services argues on its own behalf that because it did not become the broker of record for Ms. Campbell's policy until 2005, Ms. Campbell cannot state CPPA claims against it.  Alliant Mem. Supp. Mot. Dismiss at 7, 12.  National Union similarly asserts that because Ms. Campbell alleges that she received misleading marketing materials in 1999 or 2000, and because National Union did not become involved in the program until 2005, all claims against National Union based on allegedly false or misleading advertisements should be dismissed.  National Union Mem. Supp. Mot. Dismiss at 2.[27]  Virginia Surety adds that Ms. Campbell cannot maintain a claim against it, even under Rule 8, because she "does not attribute any specific false or misleading statements to Virginia Surety directly," and her conclusory allegations of conspiracy are belied by specific allegations showing that Virginia Surety did not solicit her to join the program.  Virginia Surety Mem. Supp. Mot. Dismiss at 9.  The Court considers each argument in turn.

First, the Court is not persuaded that because Ms. Campbell's CPPA claim is premised in part on a series of alleged misrepresentations about the benefit program, it is subject to Rule 9(b)'s requirement that allegations of fraud be pled with particularity.  Defendants' argument to the contrary depends primarily on two prior opinions of this Court: *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997), and *Jefferson v. Collins*, 905 F. Supp. 2d 269, 289 (D.D.C. 2012).  In *Witherspoon*, this Court observed that the plaintiff's CPPA claim was analogous to his fraud by nondisclosure claim, and the Court was persuaded that where a

---

[27] National Union also argues that the claims against AIG should also be dismissed because the conduct at issue pre-dates its involvement, *see id.*, but this factual assertion is not reflected in the allegations of the complaint, which does not identify when AIG first became involved in the program, but suggests that AIG has been involved since the program's inception, *see* 1st Am. Compl. ¶¶ 2–3, 44, 106 (alleging AIG's name appeared on enrollment letters and payment due notices, that it served as the policyholder, and that it created the "group" Trust and Ms. Campbell's policy).

plaintiff alleges deceptive trade practices, "allegations supporting the claim must be pleaded with particularity because they are akin to allegations of fraud." 964 F. Supp. at 464 (internal quotation marks and citation omitted). Subsequently, in *Jefferson*, this Court noted that it found "*Witherspoon*'s rational convincing, and given that the plaintiffs [did] not dispute Rule 9(b)'s applicability . . . , the Court . . . appl[ied] the Rule 9(b) standard to the plaintiff's fraud-based claims under the [CPPA]." 905 F. Supp. 2d at 289.

In this case, however, Ms. Campbell does not concede Rule 9(b)'s applicability to her CPPA claim, and she directs the Court's attention to recent authority from the D.C. Court of Appeals in support of her position that CPPA claims are not, in fact, subject to Rule 9(b). *See* Pl.'s Opp'n at 17–18. First, in *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, the D.C. Court of Appeals held that "to be actionable [under the CPPA], an alleged misleading statement or omission" need not be "willful or intentional," such that plaintiffs "need not allege or prove intentional misrepresentation or failure to disclose to prevail on a claimed violation of § 28-3904(e) or (f) of the CPPA." 944 A.2d 1055, 1073–74 (D.C. 2008). The court explained that the CPPA was "intended to overcome the pleadings problem associated with common law fraud claims by eliminating the requirement of proving certain elements such as intent to deceive and scienter." *Id.* at 1073 n. 20. More recently, the court repeated these points in *Saucier v. Countrywide Home Loans*, adding that "[i]n enacting D.C. Code § 28–3904(f), the Council intended to circumvent some of the hurdles in holding merchants accountable for unfair trade practices, by avoiding a close link between the elements of a common law fraud claim, such as intentional misrepresentation or willful failure to disclose, and the elements of a claim under the CPPA." 64 A.3d 428, 442–44 (D.C. 2013).

Defendants argue that the lack of a statutory requirement to plead intent should not shield Ms. Campbell from having to plead her CPPA misrepresentation claims with particularity, and they urge the Court to look beyond the particular cause of action pled to see if the underlying factual allegations in the complaint include averments of fraud. *See* Catamaran Reply at 18–20 (citing *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)). But in the context of a CPPA claim—a cause of action specifically created with the intent to relieve plaintiffs from the burden of pleading fraud—the Court finds that *Fort Lincoln* and *Saucier* counsel against holding plaintiffs to the particularized pleading requirements applicable to claims of fraud. *See Logan v. LaSalle Bank Nat. Ass'n*, 80 A.3d 1014, 1027 n.13 (D.C. 2013) (holding that damages need not "be pleaded with particularity under the CPPA," and citing *Saucier* for the proposition that the "CPPA pleading standard [is] meant to reduce [the] burden of particularized pleading required for alleging misrepresentation in action for common law fraud"). The Court will therefore deny Defendants' motion to dismiss Ms. Campbell's CPPA claim for failure to comply with Rule 9(b).

Defendants next argue that "even under Rule 8," Ms. Campbell has failed to plausibly allege that Defendants' had no intention to pay covered claims.[28] *See* Catamaran Mem. Supp.

---

[28] Defendants attempt to greatly expand this argument in their reply brief by arguing that all of Ms. Campbell's other CPPA-related allegations fail to satisfy Rule 8. *See* Catamaran Reply Br. at 24–26. However, it "it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011) (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n. 5 (D.D.C. 2008)); *see also McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair . . ., but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)); *Baloch v. Norton*, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply.").

Mot. Dismiss at 20. Ms. Campbell's complaint alleges that Defendants violated D.C. Code § 28-3904(h), which prohibits advertising "goods or services without the intent to sell them or without the intent to sell them as advertised, . . . by advertising the HealthExtras program without the intention to provide coverage or pay claims as advertised." 1st Am. Compl. ¶¶ 215–16; *id.* ¶ 22 (alleging that Defendants had no intention to pay claims that were covered by their insurance). Defendants assert that the allegation that they never intended to pay covered claims "is only a hypothetical and conclusory allegation 'devoid of further factual enhancement,' which fails to state a claim for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678). The Court agrees.

Ms. Campbell's conclusory allegation that Defendants advertised insurance coverage without the intent to sell such insurance, is effectively a bare recitation of the elements of a § 28-3904(h) claim not supported by the type of factual allegations that would render it plausible. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Ms. Campbell's opposition brief provides little or no insight into the purported factual basis for this specific asserted violation of the CPPA,[29] and the Court is unable to discern from the factual allegations of Ms. Campbell's complaint anything that would nudge her assertion that Defendants advertised coverage that they never intended to provide, *see* 1st Am. Compl. ¶¶ 82, 107, 216, from the merely possible to the plausible.[30] *See*

---

[29] In her opposition brief, Ms. Campbell lists the provisions of the CPPA she claims were violated, and then provides a separate enumerated list of the "bases of the alleged CPPA violations," but she does so without citations to her complaint and without matching any of the CPPA provisions with the actions that she believes constituted a violation. *See* Pl.'s Opp'n at 18–19.

[30] The closest that Ms. Campbell seems to come to providing factual allegations in support of this conclusory assertion is when she alleges that Defendants denied two disability claims submitted by individuals insured in other states, and that Defendants failed to provide her with a copy of the operative Master Policy when they gave her a description of her coverage. But neither of these allegations suffices to transform the possibility that Defendants never intended to pay covered claims into a plausible allegation.

*Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). The Court will therefore grant Defendants' motion to dismiss for failure to state a claim the portion of Ms. Campbell's CPPA claim alleging a violation of § 28-3904(h). *Cf. Grayson v. AT & T Corp.*, 15 A.3d 219, 252 (D.C. 2011) (holding that plaintiff failed to adequately allege a § 28-6904(h) claim where he alleged that defendants advertised certain communication services for a certain cost while never intending to provide that advertised value of service so that defendants could pocket the difference in violation of D.C. law, because he "did not provide any facts that show the unlawful intent of appellees in selling the cards").

The Court will deny, however, Defendants' respective motions to dismiss the remainder of Ms. Campbell's CPPA claim. Although Defendants argue that Ms. Campbell's entire CPPA claim must fail because her policy was valid and enforceable under D.C. law, CPPA liability is not limited to misrepresentations or trade practices that would render a policy void or unenforceable. For example, Ms. Campbell alleges that Defendants violated § 28-3904(f), which prohibits "fail[ing] to state a material fact if such failure tends to mislead," in part "by concealing from consumers that the HealthExtras program was prohibited by District of Columbia law." 1st Am. Compl. ¶¶ 211–12. By its terms, § 28-3904(f) applies regardless of whether "any consumer is in fact misled, deceived or damaged," so the fact that Defendants' alleged failure to comply with insurance laws and regulations did not result in her policy being unenforceable under D.C. law does not preclude her from asserting a violation of § 28-3904(f).

Similarly unpersuasive are Alliant Services and National Union's arguments that because they did not become involved in the alleged scheme until 2005, and because Ms. Campbell received marketing materials and enrolled in 2000, they cannot be implicated in her advertising-

related CPPA claims.  Both Defendants appear to overlook that Ms. Campbell alleges that the misleading advertising "directed to District of Columbia consumers, . . . began at least as early as 1999 *and continues to this day*," because "Defendants have not ceased to market the product in violations of the District's laws."  1st Am. Compl. ¶ 78 (emphasis added).

Finally, the Court rejects Virginia Surety's argument that Ms. Campbell has failed to state a CPPA claim against it because she "does not attribute any specific false or misleading statements to Virginia Surety directly."  *See* Virginia Surety Mem. Supp. Mot. Dismiss at 9.  As Ms. Campbell points out, her complaint alleged that Virginia Surety has been identified as the issuer and underwriter for her emergency medical benefit since she enrolled, that despite Virginia Surety's knowledge of the illegality of the HealthExtras insurance program, it joined the scheme and allowed Catamaran to use its name on materials to solicit consumers and to add a perception of legitimacy to the program, and that Virginia Surety received fees from premiums collected pursuant to the scheme.  Pl.'s Opp'n at 49–50 (citing 1st Am. Compl. ¶¶ 156–61).  To the extent that Virginia Surety may have intended to argue that CPPA liability is limited to the direct publisher of a misleading statement and does not reach one who facilitates or consents to the publication, it has provided neither argument nor authority to support such a proposition.  In the absence of any such developed argument or authority, the Court must deny Virginia Surety's motion to dismiss the CPPA claim.  *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 48 n.10 (D.D.C. 2014) ("All federal courts are in agreement that the burden is on the moving party in a Rule 12(b)(6) motion to prove that no legally cognizable claim for relief exists[.]" (internal correction marks omitted)).

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions

to dismiss.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  September 16, 2015                                    RUDOLPH CONTRERAS
                                                             United States District Judge